UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.

DALE VERNON THRUSH,

        Defendant.

                                          /

Case No. 1:20-cr-20365
Honorable Thomas L. Ludington
Magistrate Judge Patricia T. Morris

**ORDER DENYING PLAINTIFF'S SECOND MOTION IN LIMINE AND DENYING DEFENDANT'S MOTION IN LIMINE WITHOUT PREJUDICE**

This matter is before the Court pursuant to Plaintiff's Motion in Limine to Exclude Expert Testimony, ECF No. 25, and Defendant's Motion in Limine, ECF No. 27. In August 2020, Defendant Dale Vernon Thrush was indicted on multiple counts of willfully failing to pay payroll taxes and to file personal tax returns. Plaintiff, the United States of America (the "Government"), seeks to exclude testimony from a certified public accountant retained by Defendant, and Defendant seeks to prevent the Government from introducing various evidence that he argues is prejudicial or untrustworthy. For the reasons set forth below, the Government's Motion will be denied, and Defendant's motion will be denied without prejudice to his right to object to the introduction of a January 2018 letter, discussed *infra*, or his right to cross-examine the IRS records custodian called by the Government.

**I.**

**A.**

According to the Indictment, Defendant Dale Thrush owned several businesses in Mount Pleasant and Lansing, Michigan throughout the relevant period, including 402 N. Mission St. LLC

("Mission"), Xtreme Enterprises, Inc., Verno All Tune, Inc., and US Auto Repair, Inc. ECF No. 1 at PageID.1–2.

As sole owner of the businesses, Defendant was the "responsible party" and thereby required to collect and pay over payroll taxes as well as to complete and file a Form 1040 each year reporting his net income from the businesses. The Indictment alleges that Defendant failed to pay over $238,223 in payroll taxes collected at Mission between the second quarter of 2014 and the fourth quarter of 2016 and failed to file a personal income tax Form 1040 for calendar years 2013 through 2016. *Id.* at PageID.6–9. But more than just failing to pay over the taxes, the Indictment also alleges that Defendant directed nearly $500,000 from Mission's payroll account to be spent on ordinary business expenses and certain construction costs incurred by his wife between April 2014 and October 2016. *Id.* at PageID.6.

In his defense, Defendant claims that from 2014 until late 2016, he delegated the bookkeeping at Mission, including all tax filings and payroll matters, to an employee named Donna Henke. ECF No. 23 at PageID.104–05. He also erroneously believed that Henke was acting as his personal tax preparer. *Id.* During this time, Defendant allegedly worked "off-site" and was rarely in the business office. *Id.* Nonetheless, Defendant claims that he frequently inquired with Henke about the status of his business and personal taxes and was "always informed that everything was being taken care of." *Id.* at PageID.105. He apparently was satisfied with the response though he does not suggest that he was presented with any papers consistent with such a proposition.

In July 2016, Defendant hired a new bookkeeper, Sue Hastings. *Id.* at PageID.106. In a personal declaration, Hastings states that she assumed her duties as bookkeeper in August 2016 and soon discovered that Mission's bookkeeping, organized through the accounting software QuickBooks, was "very incomplete" and "could not be relied upon." ECF No. 23-2 at PageID.117.

She learned that Mission had not made any tax payments to the IRS in several quarters. *Id.* Hastings apparently tried to contact Henke but was unable to do so. *Id.* In the end, Hastings claims that she and others spent "thousands of hours" between October 2016 and November 2019, that is, several years, reconstructing Mission's finances. *Id.* at 118.

On June 22, 2017, Defendant was interviewed by an IRS Revenue Officer ("RO") attempting to collect unpaid taxes. ECF No. 20 at PageID.69. The RO informed Defendant that he would have to file his Form 1040's for 2013, 2014, and 2015 within the next six weeks but that the RO would "work with him to piece together his individual income taxes." *Id*. In response, Defendant allegedly told the RO that he could not file the Form 1040's until his business returns were completed because all of the entities were pass through entities. ECF No. 20-1 at PageID.79.

Defendant's taxes were not paid during those six weeks. On March 2, 2018, some nine months after his interview with the RO, Defendant was interviewed by IRS Special Agents who informed him that they were "investigating potential criminal violations" resulting from his unpaid taxes. ECF No. 20 at PageID.69.

According to IRS account transcripts, Defendant began making payments on his tax liability in October 2018. *Id*. Records also show that the IRS received Defendant's Form 1040's for 2013, 2014, and 2015 on January 9, 2020. *Id*. at PageID.70. Defendant claims that business finances were not corrected until November 2019. ECF No. 23 at PageID.106–07. He also claims to have sent a Form 1040 for 2016 but states that it must have been lost or unprocessed.[1] *Id.* at PageID.104.

---

[1] The status of Defendant's Form 1040 for 2016 is discussed in Section II.B.3., *infra*.

**B.**

On August 19, 2020, Defendant was indicted on ten counts of willfully failing to pay over payroll taxes and four counts of willfully failing to file a tax return. ECF No. 1 at PageID.7-9. On April 2, 2021, the Government filed a motion in limine ("First Motion in Limine"), seeking to exclude evidence of Defendant's delinquent tax payments and returns. *Id.* The Government argued that this evidence would be irrelevant to Defendant's mental state during the time period when the payroll taxes and personal returns were due and that its introduction would mislead the jury. ECF No. 20 at PageID.70–72.

In his response brief, Defendant maintained that the delinquent filings would be relevant to whether he willfully failed to account for and pay over his taxes. Simply stated, Defendant claimed that he did not know his taxes were delinquent until Henke's departure and that once he learned, he worked diligently to reconstruct his finances and pay his taxes. ECF No. 23 at PageID.103.

After surveying the relevant case law, this Court found that "Defendant's version of events, if believed, would allow a reasonable jury to infer that his failure to pay taxes and file tax returns was the result of ignorance, rather than willfulness." ECF No. 26 at PageID.141. Therefore, "Defendant's delinquent filings, if offered in conjunction with the assertions [regarding the mishandling and subsequent preparation of his taxes], would be probative of his mental state during the period in question." *Id.* The Government's First Motion in Limine was therefore denied.

The same day that its First Motion in Limine was denied, the Government filed the pending Motion in Limine to Exclude Expert Testimony ("Second Motion in Limine"). ECF No. 25. Defendant's Motion in Limine was filed shortly thereafter. ECF No. 27.

## II.

### A.

The Government argues that the testimony of Ghassan Alkamano, a certified public accountant retained by Defendant, should be excluded under Federal Rule of Evidence 702 because it would not be helpful to the jury. FRE 702 provides,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Accordingly, for "expert testimony to be admissible, the court must find the expert to be: (1) qualified; (2) her testimony to be relevant; and (3) her testimony to be reliable." *United States v. LaVictor*, 848 F.3d 428, 441 (6th Cir. 2017).

According to his expert report, Mr. Alkamano has been a licensed CPA since 1997 and currently operates his own accounting firm, Alkamano & Associates. ECF No. 25-1 at PageID.130. Mr. Alkamano specializes in small business taxes, and he and his firm prepare some 1,400 personal and business returns annually with the help of accounting software like QuickBooks. *Id.* Defendant retained Mr. Alkamano to assess whether the QuickBook records left by Henke were "sufficient to prepare [Defendant's] 1040 tax returns for the period of 2013 through 2016." *Id.* Mr. Alkamano is expected to testify that the QuickBook records left by Henke were insufficient to prepare Defendant's returns and that it was not "unreasonable" for Henke's replacement, Sue Hastings, to have taken over three years to correct the records. *Id.* at 131–133.

The Government does not challenge Mr. Alkamano's qualifications or the reliability of his methods. Instead, the Government argues that Mr. Alkamano's testimony is only intended to "spoon feed" the jury conclusions that they can reach on their own. ECF No. 25 at PageID.124. Specifically, the Government states that "the jury is easily able to understand the simple concept that Defendant [] may have been unhappy with the numbers reflected in the relevant QuickBooks accounting records in 2016 and thus elected not to timely file a Form 1040 tax return." *Id.* As support, the Government cites to the Sixth Circuit's decision in *United States v. Freeman*, 730 F.3d 590 (6th Cir. 2013).

In *Freeman*, a defendant was convicted of conspiracy to use interstate commerce facilities in the commission of murder for hire based largely on the testimony of an FBI agent who had listened to some 23,000 intercepted phone conversations. *Freeman*, 730 F.3d at 592–94. At trial, the district court allowed the agent to offer his "personal impressions" of intercepted conversations as they were played for the jury. *Id.* at 594–95. Among various other problems with the agent's testimony, the Sixth Circuit noted that the "testimony consisted of many opinions and conclusions the jury was well equipped to draw on their own." *Id.* at 597. In effect, the agent had "spoon-fed his interpretations of the phone calls and the government's theory of the case to the jury." *Id.*

The Government's reference to *Freeman* is unpersuasive. Unlike the agent's testimony in *Freeman*, Mr. Alkamano's testimony would help the jury understand an issue both material to the defense and beyond the domain of ordinary experience; namely, the nature of the QuickBooks accounting left by Donna Henke left and how long it might have reasonably taken to correct that accounting.

To convict Defendant of willfully failing to file his tax returns, "the government must prove the following elements beyond a reasonable doubt: (1) that defendant was required to file a

return; (2) that defendant failed to file a return at a time required by law; and (3) that defendant's failure to file was willful." *United States v. Fusero*, 106 F. Supp. 2d 921, 927 (E.D. Mich. 2000). "[I]n criminal tax cases, 'the statutory willfulness requirement is the voluntary, intentional violation of a known duty.'" *United States v. Aaron*, 590 F.3d 405, 408 (6th Cir. 2009) (quoting *Cheek v. United States*, 498 U.S. 192, 201 (1991)). "The showing of willfulness can be negated by 'a defendant's claim of ignorance of the law or a claim that because of a misunderstanding of the law, he had a *good-faith belief* that he was not violating any of the provisions of the tax laws.'" *Aaron*, 590 F.3d at 408 (quoting *Cheek*, 498 U.S. at 202–03).

In his own words, Defendant's primary defense at trial will be that "[he] believed that he could not use the original [QuickBooks] records to prepare tax returns and needed to create new records before he could file his returns." ECF No. 28 at PageID.182. While "[t]he defendant's belief or misunderstanding need not be objectively reasonable," *Aaron*, 590 F.3d at 408, the jury may consider the reasonableness of a belief in deciding whether it was held in good faith, *see United States v. Pensyl*, 387 F.3d 456, 459 (6th Cir. 2004) (holding that district court did not err by instructing jury "that they could consider the reasonableness of defendant's belief as a factor in determining whether the defendant actually held and acted upon that belief").

The jury is unlikely to have any experience with small business accounting or the QuickBooks accounting software. Mr. Alkamano's testimony will therefore help the jury assess the reasonability of Defendant's belief and whether it could have been held in good faith. The Government's Second Motion in Limine will be denied.

**B.**

Defendant contends that three categories of evidence should be excluded from trial: (1) Defendant's unsigned tax returns; (2) documents relating to Defendant's 2015 sale of a business

interest; and (3) IRS transcripts regarding Defendant's tax returns. ECF No. 27 at PageID.143–44. For the reasons explained below, Defendant's Motion will be denied without prejudice to (1) his right to object to the introduction of a January 2018 letter regarding the sale of two of his businesses or (2) his right to cross-examine the IRS records custodian regarding IRS recordkeeping.

1.

Defendant first argues that copies of his unsigned 2014, 2015 and 2016 individual tax returns should be excluded because they are bad acts evidence being offered for an improper purpose. ECF No. 27 at PageID.143. The returns in question were apparently provided to two of Defendant's financial lenders, Commercial Bank and Members First Credit Union. *See* ECF No. 29 at PageID.192. Even assuming that the unsigned tax returns are bad acts evidence, they are admissible because they are being offered to prove Defendant's knowledge of his legal responsibility and their probative value outweighs the risk of unfair prejudice.

The admissibility of bad acts evidence is governed by Federal Rule of Evidence 404(b). That Rule provides,

(1) Prohibited Uses. Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) Permitted Uses. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

Fed. R. Evid. 404(b) (emphasis omitted). In deciding whether evidence is admissible under FRE 404(b), the Sixth Circuit applies a three-step test:

First, the district court must make a preliminary determination regarding whether there is sufficient evidence that the "other acts" took place. The district court must then determine whether those "other acts" are admissible for a proper purpose under Rule 404(b). Finally, the district court must determine whether the "other acts" evidence is more prejudicial than probative.

*United States v. Bell*, 516 F.3d 432, 441 (6th Cir. 2008) (quoting *United States v. Lattner*, 385 F.3d 947, 955 (6th Cir.2004)). The first issue—whether there is sufficient evidence of the bad acts—is not in contention as Defendant appears to concede that he or someone acting on his behalf sent the returns to his lenders. *See* ECF No. 27 at PageID.143, 148–49.

The next issue is whether evidence of the unsigned returns is "probative of a material issue other than character." *United States v. Jenkins*, 345 F.3d 928, 937 (6th Cir. 2003). "Evidence of other acts is probative of a material issue other than character if (1) the evidence is offered for an admissible purpose, (2) the purpose for which the evidence is offered is material or 'in issue,' and (3) the evidence is probative with regard to the purpose for which it is offered." *Id.* (quoting *United States v. Haywood*, 280 F.3d 715, 720 (6th Cir. 2002)).

Defendant tacitly admits that at least some of the information provided on his unsigned returns was false or inaccurate. *See* ECF No. 27 at PageID.147–48. He therefore argues that the returns will be offered at trial to show that he "[is] a fraudulent person and the type of person who would not pay his taxes or file his tax return." *Id.* at PageID.148.

In response, the Government denies that the purpose of the unsigned returns is to prove that Defendant is a "fraudulent person" or that he misled his lenders. ECF No. 29 at PageID.192. Instead, the Government argues that the unsigned returns will be offered to show (1) that Defendant knew he had a legal obligation to file tax returns, (2) that Defendant knew he paid wages to employees, as reflected on the unsigned returns, and (3) that Defendant possessed completed returns in 2018 but declined to file them with the IRS until 2020. *Id.* at PageID.192–93.

The Government's proffered purpose is admissible. As explained in Section II.A., *supra*, Defendant's knowledge of his legal duties and financial affairs are squarely at issue in this case, and the unsigned returns would tend to show that Defendant knew of his duty to prepare and file

tax returns. *See United States v. Myers*, No. 19-5520, 2019 WL 7425387, at *3 (6th Cir. Nov. 19, 2019) (noting that defendant's prior tax return "provided evidence of his knowledge of his duty to pay income and self-employment taxes").

The third and final issue is whether the evidence would be more prejudicial than probative. As mentioned above, evidence that Defendant prepared and delivered unsigned returns to lenders is directly probative of his mental state during the years in question. And while Defendant emphasizes the risk that the jury will engage in improper character reasoning, *see* ECF No. 27 at PageID.149, he never explains why a limiting instruction would be inadequate, *see United States v. Feagan*, 472 F. App'x 382, 390 (6th Cir. 2012) (noting that risk of improper inferences from 404(b) evidence "can be reduced by a clear, concise limiting instruction indicating the specific purpose for which the evidence is admissible" and that "juries [are presumed to] correctly follow instructions that are given to them"). On balance, the probative value of the evidence outweighs the risk of the jury engaging in improper character reasoning.

Accordingly, Defendant's request to exclude evidence of his unsigned tax returns will be denied. Given the potential for prejudice identified by Defendant, a limiting instruction will be provided.

**2.**

Defendant next argues that evidence regarding the 2015 sale of two of his businesses should be excluded. ECF No. 27 at PageID.144. According to a sales agreement attached to his Motion, Defendant sold USA Auto Repair, Inc. and Extreme Enterprises, Inc. in 2015 for a purchase price of $550,000.[2] ECF No. 27-3 at PageID.162. Defendant contends that a January

---

[2] "Extreme Enterprises, Inc." is presumably the same business as Xtreme Enterprises, Inc., which was identified in the Indictment. *See* ECF No. 1 at PageID.2.

2018 letter from the purchaser accusing him of breaching the sale agreement should be excluded as bad acts evidence being offered for an improper purpose.[3] ECF No. 27 at PageID.149.

In response, the Government represents that it only intends to offer evidence that Defendant sold the businesses to prove that he possessed sufficient funds to pay his tax liability but chose not to do so. ECF No. 29 at PageID.193–94. As for the January 2018 letter, the Government states that it has no intention of offering the letter during its case in chief but may offer the letter to impeach or corroborate testimony if necessary. *Id.*

Defendant does not seem to object to the introduction of evidence of the 2015 sale other than the January 2018 letter. But even if he did, evidence of the sale would be relevant to his ability to pay his taxes and therefore the issue of willfulness. *See United States v. Blanchard*, 618 F.3d 562, 569 (6th Cir. 2010) ("[E]vidence regarding a defendant's ability to pay taxes is pertinent to whether an offense has been committed under § 7202, since it bears on the willfulness of the defendant's failure to pay over withheld tax to the government.")

Accordingly, Defendant's request to exclude evidence of the 2015 sale will be denied without prejudice to his right to object to the introduction of the January 2018 letter at trial.

**3.**

Defendant also argues that the Government should be precluded from introducing IRS account transcripts because they are "untrustworthy" for purposes of the business records and public records exceptions to the hearsay rule. *See* ECF No. 27 at PageID.145–46. He claims that because of the COVID-19 pandemic, the IRS has fallen behind in processing returns and other filings submitted by taxpayers. *Id.* at PageID.152. As an example, Defendant alleges that his 2016

---

[3] In the letter, the purchaser accuses Defendant of failing to provide a statutory unemployment form (Form UIA 1027), causing the purchaser to incur unemployment tax liability in excess of $35,000. *See* ECF No. 27-2.

return had to be mailed to the IRS multiple times before being received in March 2021. *Id.* at PageID.152–53. And according to his IRS account transcript, his 2016 return has yet to be processed. ECF No. 27-4.

Defendant's argument does not require a detailed discussion of the hearsay rule or the business records or public records exceptions. It is well established that IRS account transcripts may be introduced if otherwise admissible and properly authenticated. *See, e.g.*, *United States v. Khan*, 787 F.2d 593 (6th Cir. 1986) (holding that certified IRS transcript was admissible under absence of public record exception); *United States v. D'Agostino*, 638 F. App'x 51, 55 (2d Cir. 2016); *United States v. Lockett*, 601 F. App'x 325, 327 (5th Cir. 2015); *United States v. Goodman*, 527 F. App'x 697, 699 (10th Cir. 2013); *United States v. Fusero*, 106 F. Supp. 2d 921, 924 (E.D. Mich. 2000) ("As the Court stated during the trial, there are a number of cases holding that computer-generated records of the Internal Revenue Service (IRS), kept in the ordinary course of business, are admissible at trial pursuant to [FRE] 803(6).").

The burden is on the party challenging the admissibility of a record satisfying the elements of FRE 803(6) or 803(8) to show that the record is untrustworthy. *See United States v. Ramer*, 883 F.3d 659, 678 (6th Cir. 2018); *Miller v. Field*, 35 F.3d 1088, 1090 (6th Cir. 1994). Defendant has not carried his burden here. His primary evidence consists of two internet articles: one being a blog post from the Government Accountability Office, and the other being a news story from the Washington Post. Published in March 2021, the articles describe how millions of taxpayers are experiencing delays while the IRS grapples with the pandemic and recent changes to the tax code. *See* ECF No. 27 at PageID.152. But even if recent events have adversely affected IRS operations, there is good reason to believe that the delay experienced by Defendant is not indicative of poor recordkeeping.

In its response brief, the Government states that Defendant's 2016 return has not been processed yet because it was "flagged as potential evidence of identity theft." ECF 29 at PageID.196. In support, the Government cites to an IRS record, filed under seal, purportedly showing that the return has been internally coded as involving identity theft. *See id.*; ECF No. 33-4 at PageID.265 (showing internal codes "U1260" and "U1830") (filed under seal). The Government also states that an IRS records custodian will testify at trial that the IRS received two different and inconsistent versions of Defendant's 2016 return. ECF No. 29 at PageID.196.

As an alternative to his request for exclusion, Defendant asks that he be allowed to cross-examine the IRS records custodian on "the effect the pandemic had on the IRS record keeping." *See* ECF No. 27 at PageID.145–46, 154. He will be granted leave to do so. Presumably, the IRS custodian called by the Government will be familiar with the recordkeeping in Defendant's case and to what extent, if any, the pandemic has affected the reliability of the transcripts.

Accordingly, Defendant's request to exclude the IRS account transcripts will be denied without prejudice to his right to cross-examine the IRS records custodian.

## C.

At the end of his Motion in Limine, Defendant briefly raises a wholly separate issue: whether the Government has complied with its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). Simply put, *Brady* "requires the prosecution to turn over material exculpatory evidence to the defense." *United States v. Macias-Farias*, 706 F.3d 775, 780 n.1 (6th Cir. 2013). Defendant claims to have received copies of emails between Donna Henke, Sue Hastings, and his accountant, Frank Ross, during discovery but suggests that the Government may have other, exculpatory emails that it has not yet produced. *See* ECF No. 27 at PageID.155. His reasoning seems to be that he has only received a "few emails" while "most people write a lot of emails." *Id.*

In response, the Government represents that it previously produced all emails in its possession between Ross, Hastings, and Henke and that it produced the same emails to defense counsel again on July 8, 2021, "in an abundance of caution." ECF No. 29 at PageID.197.

Because Defendant has not filed a reply brief, it is unclear whether he was satisfied with the Government's latest production. While there is currently no evidence to suggest that the Government is withholding exculpatory information, Defendant is free to renew the issue before trial.

### III.

Accordingly, it is **ORDERED** that the Government's Second Motion in Limine, ECF No. 25, is **DENIED**.

It is further **ORDERED** that Defendant's Motion in Limine, ECF No. 27, is **DENIED WITHOUT PREJUDICE** to Defendant's right to object to the January 2018 letter at trial and to cross-examine the IRS records custodian.

Dated: July 30, 2021　　　　　　　　　　　　　s/Thomas L. Ludington
　　　　　　　　　　　　　　　　　　　　　　　THOMAS L. LUDINGTON
　　　　　　　　　　　　　　　　　　　　　　　United States District Judge