UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,                      Case No. 1:20-cr-20365

v.                                       Honorable Thomas L. Ludington
                                       United States District Judge

DALE VERNON THRUSH,

               Defendant.

_____/

**OPINION AND ORDER (1) DENYING DEFENDANT'S MOTION TO DISMISS, (2) GRANTING GOVERNMENT'S MOTION TO WITHDRAW MOTION *IN LIMINE*, (3) WITHDRAWING GOVERNMENT'S MOTION *IN LIMINE*, (4) GRANTING DEFENDANT'S MOTION *IN LIMINE* REGARDING CERTAIN EVIDENCE AT TAX TRIAL, AND (5) GRANTING GOVERNMENT'S MOTION *IN LIMINE* TO EXCLUDE TESTIMONY ABOUT DEFENDANT'S 2014 ARREST**

This case presents two cases in a single context. In August 2020, Defendant Dale Vernon Thrush was charged with ten counts of willful failure to pay payroll taxes, in violation of 26 U.S.C. § 7202, and four counts of willful failure to file a personal tax return, in violation of 26 U.S.C. § 7203. The case proceeded to trial in November 2021, but a mistrial was declared after the Government's most material witness tested positive for COVID-19 and—under administrative orders in effect at that time—could not enter the building to testify for two weeks. And a two-week adjournment was not feasible for the jury.

In July 2023, the Government filed a superseding indictment, adding three counts of wire fraud, in violation of 18 U.S.C. § 1343, to the fourteen existing tax counts. After the Government was directed to file a bill of particulars addressing the new wire fraud charges, it dismissed two of those counts. Thus, only one wire fraud count remains, Count 16, which was severed from the tax charges in February 2024.

Against that backdrop, two trials are currently scheduled. First, the trial for Count 16, the

wire fraud charge, is scheduled to begin on December 10, 2024. Second, the trial for Counts 1-14, the tax charges, is scheduled for February 26, 2025.

This Opinion and Order resolves five pending motions. Defendant filed a motion to dismiss the Superseding Indictment—which relates to all counts. And the Parties have filed four pending evidentiary motions related to the February 26, 2025, tax trial. As explained below, Defendant's Motion to Dismiss will be denied, two evidentiary motions will be granted, and one Motion will be withdrawn.

## I. BACKGROUND

### A. Tax Allegations

#### 1.

According to the Government, Defendant has owned several businesses in Lansing and Mt. Pleasant, Michigan, including 402 N. Mission St. LLC ("Mission"), Xtreme Enterprises, Inc. ("Xtreme"), Verno All Tune, Inc. ("Verno"), and USAuto Repair, Inc. ("U.S. Auto"). ECF No. 1 at PageID.1–2. As the sole owner of the businesses, Defendant was the "responsible person" for collecting and paying payroll taxes. *Id.* at PageID.6. He was also required to file a Form 1040 each year reporting his net profits and distributions from the businesses. *Id.* But the Government alleges that Defendant did not pay over $238,223 in quarterly payroll taxes collected at Mission between April 2014 and December 2016 and did not file a personal income tax Form 1040 for calendar years 2013 through 2016. *Id.* at PageID.6–9. The Government further alleges that Defendant spent almost $500,000 available to pay Mission's payroll taxes on ordinary business expenses and construction costs incurred between April 2014 and October 2016. *Id.* at PageID.6.

In his defense, Defendant claims that from 2014 until late 2016, he delegated the bookkeeping at Mission, including all tax filings and payroll matters, to a Mission employee, Donna Henke. ECF No. 23 at PageID.104–05. Defendant also maintains that he believed Henke

was acting as his personal tax preparer. *Id.* During this time, Defendant allegedly worked "off-site" and was rarely in Mission's office. *Id.* Defendant maintains that he often asked Henke about the status of his business and personal taxes. *Id.* at PageID.105. He claims that in response, Henke "always" told him "everything was being taken care of." *See id.* Indeed, he maintains that is true even though he admits that tax returns were signed by him or otherwise filed with the Internal Revenue Service (IRS). *See id.*

**2.**

Henke tells a different story—one in which Defendant was more involved.[1] *See* ECF No. 212 (sealed). Yes, Henke stipulates that while working for Defendant from 2007 to August 2016, *id.* at PageID.3464, she oversaw bookkeeping, paying bills, and paying payroll taxes, *see id.* at PageID.3464–72. And yes, Henke agrees that she was responsible for filing income tax returns until 2014. *See id.* at PageID.3513–26. But Henke alleges that in 2014, things changed. *See id.*

First, in 2014, Henke was allegedly relieved from her duty to file income tax returns.[2] *See id.* It is unclear whether this modification to her duties was because she no longer felt confident in the financial information available to her to prepare Defendant's returns or because Defendant lost confidence in her ability to do so correctly. *See id.* Still, Henke alleges that Defendant would ask her to prepare reports with financial data that could be used to prepare tax returns, including "owner's draw" expenses—personal uses of business funds and assets that owners are responsible for reporting as taxable personal income, *id.* at PageID.3494—and she would give

---

[1] Henke's testimony is drawn mostly from an evidentiary hearing held on August 8, 2024. *See* ECF No. 212 (sealed). This hearing was prompted by the Government's motion *in limine* seeking to exclude some of Henke's potential testimony at trial. ECF No. 202 (sealed). But the record was unclear about what Henke's testimony actually was, so the evidentiary hearing was necessary to decide the Motion *in Limine*.

[2] Though unclear, Frank Ross, a Certified Public Accountant, allegedly handled income tax returns from 2014 to 2016. *See* ECF No. 212 at PageID.3493 (sealed).

Defendant these reports once prepared. *Id.* at PageID.3495. After that, she contends she had no idea what Defendant did with them. *Id.* And some of the only other interactions she had with Defendant about personal tax expenses, Henke claims, were when Defendant "felt that [Henke] was putting too much information—or too many charge accounts into owner's draw." *Id.* at PageID.3491.

Second, when it came to Mission's payroll taxes, Henke alleges that she kept Defendant regularly informed that they were past due. *Id.* at PageID.3478–79, 3509, 3533–34. Henke claims that in 2014, Defendant expanded his business, *id.* at PageID.3482, and Mission stopped paying its payroll taxes because "funds weren't available to cover the taxes," *id.* at PageID.3478.[3] But consistent with her duties, Henke claims she kept generating payroll tax forms, *id.* at PageID.3480, and periodically informed Defendant of the consequences for not paying payroll taxes, *id.* at PageID.3483. And she alleges that Defendant responded that "[h]e understood" these consequences. *Id.* Yet he allegedly told Henke not to pay the payroll taxes.

---

[3] At one point, the Government understood Henke to allege that Defendant being arrested in August 2014 was *the reason for* Mission's inability to pay payroll taxes. *See* ECF No. 202 at PageID.3360–61 (sealed). Indeed, the Government's summary of an interview with Henke reads as follows:

> Henke said it all started when [Defendant] got arrested in 2014 . . . [and Defendant] had to pay $20,000 to get bailed out of jail. . . . Henke said it was a struggle financially once the word got out that [Defendant] had been charged. Some vendors reduced his line of credit, which made it harder to buy inventory. Henke said [Defendant] had to buy inventory to make money to cover his expenses, so he told her to pay the credit card bills first before payroll taxes. Henke said [Defendant] told her to hold off on paying the federal tax deposits because they could pay them quarterly. Henke said then when the quarterly was due, [Defendant] said not to pay the taxes. Henke said she told [Defendant] he needed to pay the IRS. [Defendant] told Henke 'until you name is on the door, you don't make the decisions.'

ECF No. 202-2 at PageID.3373 (sealed). But Henke later clarified that her testimony was not that the arrest was the *start* of the financial problems that led to not paying taxes. *See* ECF 212 PageID.3529 (sealed). Instead, Mission stopped paying payroll taxes in April 2014 because Defendant expanded his business, and this was "within [the] time frame" Defendant was arrested in August 2014. *Id.* at PageID.3530.

ECF No. 71-2 at PageID.1085–86 (sealed).

And third, Henke claims that Defendant retained oversight of bookkeeping matters even when he was working remotely. *See* ECF No. 212 at PageID.3469–71 (sealed). Indeed, according to Henke, Defendant would remotely access her computer to review and discuss "day-to-day activities." *Id.* at PageID.3470. Henke alleges that during these conversations, she regularly informed Defendant of Mission's outstanding bills. *Id.*

**3.**

According to Henke, stress from her bookkeeper role overwhelmed her. *Id.* at 3483–84. Indeed, Henke stated that bookkeeping for Defendant meant dealing with "a lot of organized chaos" because there was "a lot of commotion going on," and she had to handle "a lot of irons in the fire." *Id.* at PageID.3483. Specifically, Henke alleges that at the time she left, "[t]here was a lot of business" taking place in Defendant's various enterprises. *Id.*

As a result of this stress, she gave Defendant notice that she would be leaving and stopped working for Defendant in August 2016. ECF No. 71-2 at PageID.1080, 1090 (sealed). Shortly before she left, Defendant hired a new bookkeeper in July 2016—Sue Hastings. ECF No. 23 at PageID.106. Because there was some overlap between the two bookkeepers, Henke trained Hastings. *See* ECF Nos. 71-2 at PageID.1090 (sealed); 71-3 at PageID.1107 (sealed). Henke claims she notified Hastings about Mission's delinquent taxes. ECF No. 212 at PageID.3531–32 (sealed). But Hastings claims that Henke did not inform her of these delinquencies. ECF No. 71-3 at PageID.1108 (sealed).

Hastings instead claims that when she assumed her duties as Defendant's bookkeeper, she soon discovered Mission's bookkeeping was "very" incomplete and unreliable. ECF No. 23-2 at PageID.117. To that end, she learned that Mission had not made tax payments to the IRS in several quarters. *Id.* Hastings, without success, tried to contact Henke about Mission's

bookkeeping. *Id.* So Hastings allegedly notified Defendant about these shortcomings, causing "a big argument" about Mission's payroll tax status, during which Defendant allegedly stated Hastings was wrong and virtually accessed Hastings's computer "to go through all the books." ECF No. 71-3 at PageID.1109 (sealed). According to Hastings, she informed Defendant that Mission needed to pay the taxes, but Defendant told her to wait because he "hired an attorney." *Id.* at PageID.1115.

After Hastings notified Defendant about the delinquent payroll taxes, Defendant allegedly told her that these taxes were inaccurate because he and his family were independent contractors, not Mission employees—despite Defendant being the company's sole owner. *Id.* at PageID.1110–1112. In any event, Hastings claims that she and others spent "thousands of hours" between October 2016 to November 2019—more than three years—reconstructing Mission's finances.[4] ECF No. 23-2 at PageID.118.

### 4.

On June 22, 2017, attempting to collect Defendant's unpaid taxes, an IRS Revenue Officer ("RO") interviewed Defendant. ECF No. 20 at PageID.69. The RO told Defendant to file his Form 1040s for 2013, 2014, and 2015 within six weeks and offered to "work with [Defendant] to piece together his individual income taxes." *Id.* Defendant's taxes went unpaid during those six weeks. ECF No. 20-1 at PageID.79. And Defendant allegedly told the RO that he could not file the Form 1040s until his business filings were reconstructed because all his businesses were pass-through entities. *Id.* Thus, his personal returns depended on the business's "income and expenses first being determined." *Id.*

About nine months later, IRS Special Agents interviewed Defendant on March 2, 2018.

---

[4] Oddly enough, though, Hastings alleges that Defendant occasionally accesses QuickBooks and "screws up [Hasting's] paperwork"—sometimes deleting entries without much explanation. ECF No. 71-3 at PageID.1102–03 (sealed).

*See* ECF No. 20 at PageID.69. These agents informed him that they were "investigating potential criminal violations" flowing from his unpaid taxes. *Id.* According to IRS account transcripts, Defendant began making payments on his tax liability in October 2018. *Id.* Records also show that the IRS received Defendant's Form 1040s for 2013, 2014, and 2015 on January 9, 2020. *Id.* at PageID.70. Defendant claims that business finances were not corrected until November 2019. ECF No. 23 at PageID.106–07. He also claims to have sent a Form 1040 for 2016 but states that it must have been lost or unprocessed, so he sent another Form 1040 for 2016. *Id.* at PageID.104.

Even so, the Government charged Defendant in a fourteen-count indictment on August 19, 2020. ECF No. 1. Counts 1 through 10 alleged that Defendant willfully failed to pay quarterly payroll taxes for ten quarters from 2014 to 2016, in violation of 26 U.S.C. § 7202. *Id.* at PageID.5–7. Counts 11 through 14 alleged that Defendant willfully failed to file personal tax returns from 2013 to 2016, in violation of 26 U.S.C. § 7203. *Id.* at PageID.8–9.

## B. Mistrial and Appeal

After several adjournments during the COVID-19 pandemic, a jury trial began in November 2021. ECF No. 61 at PageID.523. At trial, the Government asserted that "the evidence [would] show that for 10 quarters between April 2014 to December 2016, [Defendant], through his company 402 North Mission Street, took out six figures worth of payroll taxes from his employees' paychecks but failed to pay them over to the IRS." ECF No. 102 at PageID.1533. The Government further asserted that the evidence at trial would show that "[Defendant] invested large sums of money into [a development project] right around the time that he refused to pay over payroll taxes." *Id.* at PageID.1534.

Defendant, on the other hand, asserted that he "doesn't know anything about bookkeeping or taxes, and [] never did his own taxes" but hired "a good family friend" to be his bookkeeper. *Id.* at PageID.1537–38. And that bookkeeper, according to Defendant, had "control"

over the financial part of his business and was responsible for paying the business's payroll taxes and Defendant's personal income tax returns. *Id.*

This court declared a mistrial four days into the trial. That is because the Government's most material witness and the undersigned's spouse both tested positive for COVID-19, and the jury could not accommodate a two-week adjournment.[5] ECF No. 61.

Defendant later filed a motion to dismiss on double-jeopardy grounds.[6] ECF No. 64. This Court denied that motion. *United States v. Thrush*, No. 1:20-CR-20365, 2022 WL 2373351, at *4 (E.D. Mich. June 30, 2022). He appealed, ECF No. 97, and the case was stayed pending that decision, ECF No. 100. On July 17, 2023, the Sixth Circuit affirmed this Court's decision, holding that, under the circumstances, "an adjournment was proper and not an abuse of discretion." *United States v. Thrush*, No. 22-1588, 2023 WL 4564769, at *6 (6th Cir. July 17, 2023).

**C. Allegations Augmented, Particularized, Partially Dismissed, Severed, and Narrowed**

**1.**

After the appeal, the Government filed a superseding indictment on July 26, 2023, which alleged the same 14 tax counts as the first indictment (Counts 1–14). *Compare* ECF No. 1 *with* ECF No. 118. But the Government augmented its allegations—the Superseding Indictment added three new wire fraud charges. ECF No. 118 at PageID.2138–41. What warranted these new charges almost three years into a tax evasion case? Defendant allegedly checked a box that

---

[5] Administrative Orders at that time prohibited court staff who had close contact with a person who tested positive for COVID-19 from returning to the courthouse without waiting 10 days and presenting a negative COVID-19 test to the court administrator. And, under the circumstances, those Orders required the undersigned to wait 5 days and receive a negative COVID-19 test before returning to the Court.

[6] Part of the reason Defendant moved to dismiss on double-jeopardy grounds was that the Government allegedly knew that its material witness tested positive for COVID-19 with a rapid test before the jury was empaneled and did not inform the Court. *See* ECF No. 96 at PageID.1503.

he was not "subject to an indictment" when applying for a Paycheck Protection Program[7] (PPP)

loan during this case (Count 16) and allegedly falsely stated that he complied with PPP

regulations when applying for PPP loan forgiveness (Counts 15 and 17). *Id.*

Indeed, the Government alleged that Defendant "knowingly devised a scheme and artifice

to defraud, and to obtain money and property, by means of materially false and fraudulent

pretenses, representations, and material omissions" transmitted by wire communication. ECF No.

---

[7] In March 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act, which—among other things—authorized the "single largest element of U.S. Pandemic relief[:]" The Paycheck Protection Program (PPP). Susan C. Morse, *Emergency Money: Lessons from the Paycheck Protection Program*, 55 U. MICH. J.L. REFORM 175, 176 (2021); *see also* Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, § 1102(a), 134 Stat. 281, 286-93 (2020) (codified at 15 U.S.C. § 636(a)(36)) (establishing the PPP). The U.S. Small Business Administration (SBA) administered the PPP, and it entailed the following: an eligible small business could apply for a PPP loan through a bank authorized to process PPP loan applications. PPP loans were backed by the SBA and required no collateral or guarantee, *see* 15 U.S.C. § 636(a)(36)(J). If approved, PPP loan borrowers were authorized to use PPP funds for employee compensation, payroll costs, continuing group healthcare benefits, interest payments on any mortgage obligation, rent, utilities, and interest on any debt obligations incurred before the covered period. *See* 15 U.S.C. § 636(a)(36)(F)(i). PPP loan borrowers were later eligible for forgiveness if, during the covered period corresponding with their loan, they met three conditions: (1) employee and compensation levels were maintained; (2) the loan proceeds were spent on payroll costs and other eligible expenses; and (3) at least 60% of the loan proceeds were spent on payroll costs. *See PPP Loan Forgiveness*, U.S. Small Bus. Admin., https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program/ppp-loan-forgiveness (last updated May 24, 2023) [https://perma.cc/NNH6-KTFS]. Under the first iteration of the CARES Act, the "covered period" for PPP loans was only eight weeks, but it was later extended to 24 weeks. *See* Business Loan Program Temporary Changes; Paycheck Protection Program—Revisions to Loan Forgiveness and Loan Review Procedures Interim Final Rules, 85 FR 38304-01 (June 26, 2020) (citing § 1106 of the Cares Act). Once a borrower applies for loan forgiveness, the SBA "may request information and documents to review" the calculation of the borrower's loan-forgiveness amount, including payroll tax filings, such as Form 941s. *Id.* As of October 2020, so long as the borrower submitted a loan-forgiveness application within 10 months of the completion of the covered period, the borrower was not required to make any payments on the loan "until the forgiveness amount is remitted to the lender by SBA." *Paycheck Protection Program: Frequently Asked Questions (FAQs) on PPP Loan Forgiveness*, U.S. Small Bus. Admin. (Aug. 11, 2020), https://www.sba.gov/sites/sbagov/files/2020-10/PPP%20-%20Loan%20Forgiveness%20FAQs%20%28October%2013%2C%202020%29.pdf [https://perma.cc/CJK4-6QLN].

118 at PageID.2138. Specifically, it alleged that Defendant applied for a PPP loan in February 2021 "with materially false and fraudulent representations" and that in July 2021 and September 2021, he filed "PPP loan forgiveness applications with materially false and fraudulent representations about the use of the PPP loan funds and . . . Mission's entitlement to PPP loan forgiveness." *Id.* at 2139. The Government also alleged that Defendant engaged in a "scheme to defraud" and "unjustly enrich himself" by using "PPP loan proceeds and subsequent loan forgiveness" impermissibly for "personal investment account expenses, capital expansion projects, and payment of part of [his] delinquent payroll tax liability underlying Counts [1–10]." *Id.*

Notably, the PPP loan application warned that "knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law" and cited three federal statutes: (1) § 18 U.S.C. 1001 and 3571; (2) 15 U.S.C. § 645; and (3) 18 U.S.C. § 1014. ECF No. 124-4 at PageID.2214. The Government could have presumably pursued charges under any of those three statutes. Yet for unexplained reasons, the Government charged Defendant with violating the wire fraud statute, 18 U.S.C. § 1343, asserting a fraudulent inducement theory. *See* ECF No. 118.

**2.**

On September 5, 2023, Defendant filed a motion to dismiss the new wire fraud counts, ECF No. 123, and a motion to sever the wire fraud counts from the original tax counts, ECF No. 122. This Court denied the motion to dismiss but directed the Government to file a bill of particulars for Counts 15 and 17—the allegations that Defendant falsely stated his PPP loan-proceed-use complied with the PPP regulations in loan-forgiveness applications. ECF No. 134. The Government promptly filed its bill of particulars. ECF No. 135. But then the Government did an about-face: it filed an unopposed motion to dismiss Counts 15 and 17 with prejudice because the Government conceded they were "no longer readily provable using evidence

admissible at trial," ECF No. 142 at PageID.2488. This Court granted the Government's unopposed motion. ECF No. 146. Thus, only Count 16—the allegation that Defendant misrepresented he was *not* subject to an indictment in a PPP loan application—remained. *See* ECF No. 118 at PageID.2141. This Court then severed the remaining wire fraud count from the original tax counts, reasoning that the tax and wire fraud counts are too unrelated and should be tried separately. See ECF No. 148 at PageID.2592–95.

**3.**

On March 18, 2024, the Government filed a bill of particulars outlining the "[a]cts [r]elated to Count 16." ECF No. 154 at PageID.2664. The Government asserted that "transactions relevant to Counts 15 and 17"—the counts the Government voluntarily dismissed—were "also relevant to show the wire fraud scheme charged in Count 16." *Id.* at PageID.2663–64. According to the Government, proofs relating to whether Defendant used the PPP loan proceeds according to PPP regulations were relevant to prove the second part of the alleged two-part scheme: that Defendant submitted "two PPP loan forgiveness applications with materially false and fraudulent representations about the use of the PPP loan funds and . . . Mission's entitlement to PPP loan forgiveness." *Id.* at PageID.2664; *see also* ECF No. 118.

Responding to this bill of particulars on Count 16, both Parties indicated that they would call expert witnesses to testify about the relevant PPP loan regulations and whether Defendant's alleged conduct complied with them. *See* ECF Nos. 169; 171. Importantly, the Government's expert asserted she would testify that money received from PPP loans was not "fungible," ECF No. 170 at PageID.2853, and that "the PPP program criteria required that the loan recipient must spend the *specific proceeds* on the allowable uses as enumerated under the program guidelines," *id.* at PageID.2855 (emphasis added). But Defendant's expert asserted he would testify that PPP loan proceeds could be comingled with the borrower's other accounts, even though it was

prudent not to comingle the proceeds. *See* ECF No. 171 at PageID.2878–80. In this way, the *specific loan proceeds* were not required to be used for PPP-approved expenses, and a borrower complied with PPP regulations so long as any of its business funds were, in fact, used to pay for PPP-approved expenses. *See id.* After reviewing each expert's anticipated testimony, it was "clear that the Parties [were] attempting to advance two very different—and incompatible— interpretations of the CARES Act and relevant PPP loan regulations." ECF No. 172 at PageID.2884. And although any such expert testimony featuring legal conclusions would be excluded at trial, this Court directed supplemental briefing to resolve the legal dispute to "accurately instruct the jury about *what the law is*" regarding permissible uses of PPP loan proceeds. *Id.* (emphasis in original).

The Parties submitted supplemental briefs, but neither "contain[ed] *any* legal authority supporting the Government's contention" that "loan proceeds were *not* fungible and that funds could not be commingled with other funds of the borrower." ECF No. 186 at PageID.3089 (emphasis in original). Accordingly, on June 21, 2024, this Court determined that the jury instructions would be modified to reflect that legal conclusion. *Id.* So the following instruction was added:

> There was no PPP Rule or other law prohibiting the comingling of PPP loan proceeds with other borrower funds. To that end, PPP loan proceeds were fungible, meaning they were interchangeable with other funds of the borrower.

*Id.* Additionally, this Court determined that "[i]n accordance with the instructions . . . evidence of [Mission's] payments for PPP-approved expenses during the covered periods up to $231,060.00 will be admissible at trial. Conversely, evidence of payments or expenditures for *non-PPP-approved expenses will be excluded at trial* because such evidence is irrelevant." *Id.* (citing FED. R. EVID. 402). Indeed, to demonstrate that Defendant misrepresented his entitlement

to PPP loan forgiveness at trial, the Government must necessarily prove that "Defendant *did not* pay $231,060.00 in PPP-approved expenses during the covered periods like he represented he did in his PPP loan-forgiveness applications." *Id.* at PageID.3090.

Four days later, the Parties appeared for a final pretrial conference. *See* ECF No. 185. Importantly, at this conference, the Government acknowledged that the accounting reflected that Defendant paid $231,060.00 worth of PPP-approved expenses during the relevant covered periods. *See* ECF No. 214 at PageID.3559.

The next day, Defendant filed a motion to dismiss Count 16. ECF No. 192. The Government responded that Count 16 should not be dismissed but elected to narrow its theory of the case. ECF No. 196. The Government's newly articulated narrower theory is "that Defendant's scheme to defraud involved obtaining a PPP loan that he was not eligible to receive, then seeking and securing forgiveness for that loan." ECF No. 196 at PageID.3288. On August 19, 2024, this Court denied Defendant's motion to dismiss Count 16. *See* ECF No. 214. And this Court reiterated that "any evidence of [Mission's] payments for non-PPP approved expenses will be excluded at trial." *Id.* at PageID.3565 (citing ECF No. 186 at PageID.3090).

### D. Trial Dates, Recent Developments, and Pending Motions

#### 1.

Take a breath; that was a lot. And this intricacy is precisely why this Court severed the tax and wire fraud counts that the Government tried to join. But there is more.

After several adjournments, the trial for the tax charges (Counts 1–14) was scheduled to begin on September 24, 2024. ECF NO. 214 at PageID.3556, n.1. Given that several motions were pending at that time—many of which are discussed below—the tax trial was adjourned and is now scheduled to begin on February 26, 2025. *See* ECF No. 225. The trial for the wire fraud charge (Count 16) is scheduled to start on December 10, 2024. *See* ECF No. 214 at PageID.3569.

**2.**

Shortly after the tax trial was adjourned, the Government contacted Sue Hastings's attorney (the bookkeeper the Defendant hired to replace Donna Henke) to notify him that it would like to discuss Hastings's testimony in this case. ECF No. 228-7 at PageID.3762. The Government also subpoenaed Hastings to testify in both trials, but it was apparently more interested in her testimony for the December 10, 2024, wire fraud trial involving Defendant's PPP Loans. *See id.* at PageID.3761. Hastings's attorney responded, "[m]y client has asked that I not expend additional time on this matter. She does not want to talk to you and prefers that I do not talk to you." *Id.*

The Government persisted, and Hastings's attorney spoke with the Government over the phone. *See* ECF No. 228 at PageID.3676–77. Hastings's attorney stated that her testimony "would be consistent with her previous July 26, 2023, grand jury testimony" for the wire fraud case, so the Government asked if "Hastings would be more willing to meet . . . for a witness trial preparation meeting if the meeting were covered by the terms of a standard proffer letter." *Id.* at PageID.3677–78. According to the Government, Hastings's attorney indicated that the proffer letter "protections might make Hastings more likely to meet." *Id.* at PageID.3678.

So the Government emailed Hastings's attorney a proffer letter on September 27, 2024. *See* ECF No. 228-7 at PageID.3761. The proffer letter read as follows:

Dear Sue Hastings:

As you know, we would like to schedule a meeting for the purpose of receiving statements, testimony, emails, and documents from your regarding certain matters known to you. We will consider this proffer in deciding how to resolve this investigation and prosecution as it relates to you. This letter sets forth all of the terms of this proffer discussion. These terms are:

(1) You agree to make a complete and truthful statement of your knowledge of (and role in) the matters under investigation, and to fully and truthfully answer all questions. This means, for example, that you may not omit facts about crimes,

other participants, or her involvement in the offenses, and must volunteer all
information that is reasonably related to the subjects discussed in the debriefing.

(2) Except as otherwise specified in this letter, no information, evidence, or
statement made by you during future proffer communications will be offered
against you in the government's case-in-chief in any criminal prosecution of you
for the matters currently under investigation.

(3) If you are prosecuted, the government may use your information, evidence, or
statements in cross-examining you, and to rebut any evidence offered by you that
is inconsistent with the statements made during this discussion. This is to ensure
you do not abuse the opportunity for this proffer discussion by making false or
misleading statements, either at the proffer discussion or at trial.

(4) The government may make derivative use of, and may pursue any
investigative leads suggested by, any information, evidence, or statement
provided by you, without restriction. This means, for example, that if your
statements lead the government to develop additional evidence against you, the
government may use this derivative evidence in any manner, including in its case-
in-chief against you and at sentencing.

(5) Except as otherwise specified in this letter, if you are convicted (either by plea
or after trial), the government will not use your statements as direct evidence in
support of any increase to the applicable offense level under the United States
Sentencing Guidelines or in support of any upward variance from the applicable
Guideline range, as permitted by USSG § 1B1.8. Notwithstanding these
exclusions, the government retains the right to otherwise use your statements at
sentencing. In addition, the government may also use for sentencing purposes all
information previously known to the government, and all information obtained or
discoverable through another source.

(6) This proffer discussion is not a "plea discussion" within the meaning of
Fed.R.Crim.P. 11 (f) or Fed.R.Evid. 410. Any use of the statements and
information provided at this proffer discussion will be governed by the terms of
this letter, and not Fed.R.Crim.P. 11(f) or Fed.R.Evid.410.

(7) If you fail to provide truthful and complete information (such as by making a
false statement, providing false information, omitting facts or otherwise
misleading the government), there are no restrictions on the government's use of
any statements made by you or information provided by you. The government
may then also bring additional charges against you based upon the failure to
provide truthful and complete information, such as perjury, obstruction of justice
and false statements charges.

This letter contains the entire agreement regarding the terms of this proffer
discussion.

ECF No. 228-4 at PageID.3744–45. Hastings's attorney said he would "forward the attached

proffer letter to [Hastings] for consideration." ECF No. 228-7 at PageID.3760.

On October 8, 2024, Hastings's attorney emailed the Government conveying a message from Hastings. *Id.* at PageID.3759. Hastings told her attorney that she would not speak with the Government before the December 10, 2024, wire fraud trial and intends to testify consistently with her grand jury testimony. *Id.* Before the grand jury, Hastings alleged that she helped Defendant complete the PPP Loan Application that triggered the remaining wire fraud charge (Count 16). *See* ECF No. 228-2 at PageID.3704. According to Hastings, she completed the "top part of the loan" application. *Id.* But she claims that Defendant completed the rest of the application, including the portion with Defendant's initials certifying that he was not subject to an indictment when applying for the loan. *See id.* at PageID.3704–06.

### 3.

The next day—October 9, 2024—Defendant filed a motion to dismiss the Superseding Indictment. ECF No. 226. In essence, Defendant asserts that the Government sent the proffer letter to Hastings to intimidate her into not testifying in Defendant's favor at his tax-charge trial in February 2025. *See id.* at PageID.3657–60. Five days later, Hastings's attorney emailed the Government with the following message:

> Even though you told me that . . . Hastings has no risk of being prosecuted, the proffer letter that you sent to me and that I forwarded to her, terrified her. The proffer letter and your request that she have a further meeting with you to discuss her testimony has upset my client. She has asked me to reiterate that she has no interest in talking to you to prepare for her Trial testimony.

ECF No. 228-9 at PageID.3770. Soon after, Hastings retained a new attorney. *See* ECF No. 234-1. That attorney notified the Government that "[b]ased primarily upon the recent actions taken by the Government during the prosecution of Mr. Thursh, my client now has a legitimate and realistic fear of prosecution such that she now wishes to invoke her Fifth Amendment privilege." *Id.* at PageID.3841.

So the Government applied for an order to compel witness Hastings to testify and provide information and grant her immunity for this testimony and information under 18 U.S.C. §§ 6002–6003. ECF No. 234. On November 13, 2024, this Court granted the application and directed Hastings to "testify and provide information at all hearings and trials in this matter and any further proceedings resulting from the trials." ECF No. 235 at PageID.3843. And, consistent with 18 U.S.C. § 6002, "no testimony or other information compelled . . . (or any information derived directly or indirectly from such testimony or other information) may be used against [Hastings] in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with" this Court's November 13, 2024, order. *Id.*

### 4.

To recap where this case stands, there are two trials scheduled: one trial is calendared for December 10, 2024, at which the wire fraud charge related to PPP loans, Count 16, will be tried, and the other trial is scheduled for February 26, 2025, at which the tax counts pertaining to Defendant's alleged failure to pay payroll taxes and failure to file individual tax returns, Counts 1-14, will be tried. One witness, Defendant's later hired bookkeeper, Sue Hastings, has use immunity to testify and provide information at both. ECF No. 235.

Against that backdrop, there are seven pending motions. One motion is Defendant's Motion to Dismiss the Superseding Indictment on witness intimidation grounds, ECF No. 226—which relates to all remaining Counts—and is discussed below, *see infra* Part II. Four motions, ECF Nos. 202; 213; 218; and 222, are evidentiary motions related to the tax counts and are also discussed below, *see infra* Part III. And the final two motions are evidentiary motions concerning the wire fraud charge about PPP loans, ECF Nos. 233; 238, and they will be addressed in a separate opinion because briefing is still ongoing.

- 17 -

## II. DEFENDANT'S MOTION TO DISMISS

In Defendant's Motion to Dismiss, he argues that the Government's proffer letter is an "eleventh hour" attempt to intimidate Hastings into "giv[ing] the Government the testimony it wants," or else face prosecution. *See* ECF No. 226 at PageID.3661–62. In essence, Defendant contends that the Government's actions "are driving . . . Hastings off the stand." ECF No. 232 at PageID.3807. And Defendant argues that the Government's conduct substantially interferes with his ability to call Hastings on his behalf, thus depriving him of his due process right to present his defense. *See* ECF No. 226 at PageID.3659. As a result, Defendant requests that "all counts be dismissed . . . or alternatively, the Government should be" ordered to grant Hastings immunity.[8] *Id.* at PageID.3660. Defendant's Motion will be denied.

### A.

Under the Sixth Amendment, defendants possess a right to present witnesses to establish their defense. *See Washington v. Texas*, 388 U.S. 14, 19–23 (1967). And this right "precludes prosecutors and judges from improperly threatening witnesses with . . . prosecution." *United States v. Stuart*, 507 F.3d 391, 398 (6th Cir. 2007) (citing *Washington*, 388 U.S. at 19; *Webb v. Texas*, 409 U.S. 95, 97–98 (1972) (per curiam)). Establishing a claim of witness intimidation is no easy task. *See id.* Indeed, to do so, defendants must demonstrate three things: that (1) a government actor engaged in misconduct, (2) the misconduct amounts to "*substantial*

---

[8] Many cases discussing government witness intimidation suggest that when a claim of intimidation is successful, the proper remedy is a mistrial (if the trial already occurred) or court-ordered grant of witness immunity (when the trial has not occurred)—not dismissal. *See, e.g.*, *United States v. Wellman*, 26 F.4th 339, 352–53 (6th Cir. 2022) (discussing mistrial remedy after trial occurred, even though the claim of witness intimidation was ultimately unsuccessful); *see also United States v. Emuegbunam*, 268 F.3d 377, 400–02 (6th Cir. 2001) (discussing witness immunity as a potential remedy). The Government does not raise this point, and this Court ultimately finds Defendant's claim of intimidation lacking, so this Court will assume dismissal could be a proper remedy. *See United States v. Roach*, 502 F.3d 425, 437 (6th Cir. 2007) (implicitly assuming dismissal was a proper remedy for government intimidation when denying the claim of intimidation).

interference with a witness's free and unhampered determination to testify," and (3) "that any inappropriate conduct was not harmless." *See id.* (cleaned up) (emphasis added). These elements are addressed below.

B.

Defendant has not met his burden in demonstrating a claim of witness intimidation. Defendant has not presented clear Government misconduct. Even if he did present misconduct, Defendant has not shown that it substantially interfered with Hasting's unhampered decision to testify. And because Hastings now has immunity for her testimony, any Government misconduct is ultimately harmless.

1.

First, Defendant has not presented clear Government misconduct. Defendant bases his Motion on the perceived impropriety of the proffer letter that the Government sent to Hastings's attorney.[9] *See* ECF No. 226 at PageID.3658. But the record indicates that the Government did not send this "standard proffer letter" until after Hastings's former attorney stated that it might make her more comfortable meeting with the Government before trial—not because the Government sought to engage in a pernicious intimidation campaign to drive Hastings off the stand as Defendant argues. *See* ECF No. 228 at PageID.3677–78. And Hastings's former

_____

[9] In Defendant's Reply, he notes that the Government attached IRS transcripts that relate to Hastings's personal tax returns in its Response Brief with little explanation of how these relate to this case to intimidate her into cooperating with the Government. ECF No. 232 at PagID.3807. To Defendant's point, the only explanation the Government provided is that it attached these documents because it "has reason to believe that defense counsel may ask Hastings certain cross-examination questions that will cause Hastings to invoke her Fifth Amendment privilege against self-incrimination." ECF No. 228 at PageID.3672 n.1 (citing ECF No. 230 (sealed)). The Government's reasoning is not entirely intuitive unless it attached these documents to suggest that it is Defendant—not the Government—who wants to prevent Hastings from testifying since it could harm Defendant. But even if the Government was seeking Hastings's cooperation, "efforts to induce witnesses" to cooperate and testify against a defendant "in exchange for lenient treatment," even if zealous, do not represent "government misconduct." *United States v. Clark*, 319 F. App'x 395, 404–05 (6th Cir. 2009).

attorney's emails to the Government further indicate that this letter was an innocuous attempt to meet with Hastings to prepare for the December 10, 2024, wire fraud trial, not to intimidate Hastings. *See* ECF No. 228-4 at PageID.3741 (responding to the Government's summary of the phone call in which the proffer letter was discussed without surprise, stating, "I will forward the attached proffer letter to my client for her consideration"). Finally, if the Government's "obvious goal" were to intimidate Hastings into not testifying as Defendant claims, ECF No. 226, then it would not have later applied to grant Hastings immunity to testify, ECF No. 234.

### 2.

Second, even if the Government engaged in misconduct, Defendant has not demonstrated that it substantially interfered with Hastings's unhampered decision to testify. What misconduct substantially interferes with a witness's free and unhampered decision to testify? A government actor—prosecutors, courts, or otherwise—directly threatening witnesses with prosecution or unfavorable consequences based on their testimony or badgering them into not testifying. *See United States v. Foster*, 128 F.3d 949 (6th Cir. 1997); *see also United States v. Arthur*, 949 F.2d 211 (6th Cir. 1991).

Take *Foster*. In *Foster*, the government granted one of the defendant's material witnesses immunity for his testimony. *See id.* at 951. While this witness testified at a grand jury hearing, "the government repeatedly made it clear to [the witness] that it believed he was lying and that his testimony could subject him to perjury charges." *Id.* at 954. Shortly before trial, the government contacted this witness's attorney and notified him that the government would revoke the witness's immunity if he testified for the defendant. *Id.* at 953–54. The Sixth Circuit stated that "the government's conduct . . . was clearly improper," and it suggested that if the witness's attorney conveyed the government's threat of revoked immunity to the witness, it "substantially

interfered with [the witness's] free determination to testify." *Id.* at 954; *see also United States v. Thomas*, 488 F.2d 334, 335–36 (6th Cir. 1973) (per curiam) (finding substantial interference when a special agent approached a witness during a recess and told "him that he would be prosecuted . . . if he testified" for the defendants).

And consider *Arthur*. There, one of the defendant's material witnesses—a witness who had previously confessed to a crime that would exculpate the defendant—planned to testify at the defendant's trial. 949 F.2d at 213–16. Even so, the witness, represented by counsel, notified the court that he wanted to testify. *Id.* at 216. Still, the district court "strongly encouraged [the witness] to assert the fifth amendment." *Id.* at 214. Indeed, the "district court stated, 'I think it's not to your best interest to testify because anything you say may be held against you in another prosecution against you . . . .'" *Id.* So the witness refrained from testifying. *Id.* The Sixth Circuit held that the court's persistent badgering, which induced the witness into not testifying, was a bridge too far and hampered the witness's decision to testify freely. *Id.* at 216; *accord Webb*, 409 U.S. at 98 (reversing a conviction when the trial judge severely admonished the defendant's sole witness about testifying, and the witness declined to testify as a result).

By contrast, mere warnings about the consequences of testifying—especially when a witness's attorney acts as a conduit for such warnings—do not amount to substantial interference. *United States v. Wellman*, 26 F.4th 339, 352 (6th Cir. 2022). For instance, in *Wellman*, a witness that the government called "contradicted aspects of her grand jury testimony." 26 F.4th at 352–53. The government, "during a bench conference with the defense and [the witness's] own counsel, indicated that a Fifth Amendment colloquy might be necessary because the prosecutor had a provable perjury case against" the witness. *Id.* at 353 (cleaned up). The witness's attorney then informed her of her rights, and she "returned to the stand and

clarified her previous testimony to conform to her grand jury testimony." *Id.* Reasoning that (1) there was, in fact, perjury, and the prosecutors noted they would consider charges "regardless of whether [the witness] changed her testimony or decided to take the Fifth," and (2) the witness's counsel acted as a conduit in "warn[ing] her about possible perjury, insulating her from direct government coercion," the government did not "substantially interfere with [the witness's] ability to testify freely." *Id.* (noting the "warning here contrasts sharply with unconstitutional attempts at intimidation and ex parte threats by prosecutors or their agents in other cases" (citing *Foster*, 128 F.3d at 953–54; *Thomas*, 488 F.2d at 336)).

Further illustrating that mere warnings do not substantially interfere with a witness's decision to testify is *United States v. Stuart*, 507 F.3d 391, 398 (6th Cir. 2007). In *Stuart*, the government, based on two of the defendant's witnesses presenting evidence that conflicted with the government's, suggested that defendant's witnesses should be warned about the consequences of perjury. *Id.* at 394. The defendant indicated that, but for the government's reference to the consequences of perjury, he would have testified. *Id.* at 398. But the government had ensured that when making these references to perjury, it was not threatening anyone with perjury prosecution. *Id.* In the end, the Sixth Circuit held that the government's passing warning about perjury was insufficient to establish a claim of witness intimidation. *Id.* at 398–99; *see also United States v. Pierce*, 62 F.3d 818, 832–33 (6th Cir. 1995) (finding government misconduct but not a substantial interference with the witness's ability to testify when the government interrogators were belligerent and advised witnesses of potential prosecution, especially when the witnesses still testified).

Here, the Government's conduct did not substantially interfere with Hastings's unhampered decision to testify freely. For starters, the record suggests that the Government's

- 22 -

proffer letter was neither a threat of prosecution or unfavorable consequences if Hastings testified nor an attempt to badger Hastings into not testifying. *See, e.g.,* ECF No. 228-9 at PageID.3770. Defendant does not demonstrate that the Government's proffer letter directly threatened Hastings with, for example, removal of immunity or independent prosecution, unlike in *Foster* and *Thomas*. Indeed, all references to prosecution in the letter contemplate hypothetical prosecutions, using phrases like "[i]f you are prosecuted,"—not phrases like, say, "when you are prosecuted for your testimony." *See* ECF No. 228-4 at PageID.3744–45. And, after all, Hastings's former attorney admitted that the Government "told [him] that . . . Hastings has no risk of being prosecuted." ECF No. 228-9 at PageID.3770. Nor does Defendant show that the Government consistently badgered Hastings or encouraged her to invoke her Fifth Amendment rights, unlike in *Arthur* or *Webb*.

At most, the proffer letter contained mere warnings about the consequences of providing false information "to ensure [Hastings did not] abuse the opportunity for [the] proffer discussion by making false or misleading statements." ECF No. 228-4 at PageID.3744–45. For example, the proffer letter expressly states that the Government will not use Hastings's statements against her unless they are untruthful and then warns her of potential charges stemming from providing false information:

> If you fail to provide truthful and complete information (such as by making a false statement, providing false information, omitting facts or otherwise misleading the government), there are no restrictions on the government's use of any statements made by you or information provided by you. The government may then also bring additional charges against you based upon the failure to provide truthful and complete information, such as perjury, obstruction of justice and false statements charges.

*Id.* at 3745. These are standard terms for proffer letters. *See, e.g.*, Ronald V. Miller, Jr., *Example Proffer Agreement*, THE MARYLAND LAWYER (May 11, 2023), https://www.marylandlawyerblog .com/example-proffer-agreement [https://perma.cc/SR4F-DKXW] (featuring a standard proffer

letter with substantially the same terms as the Government's letter here). And, like in *Wellman*, all of this information was provided to Hastings through her former attorney, *see* ECF Nos. 228-7; 228-9, "insulating her from direct government coercion" and rendering any interference insubstantial, 26 F.4th at 353.

In sum, even if the Government sending a proffer letter to Hastings shortly before trial was ill-advised or improper, it did not substantially interfere with her unhampered decision to testify freely. The letter did not threaten prosecution or unfavorable consequences if Hastings testifies, and it did not badger Hastings or encourage her to invoke her Fifth Amendment rights. And any reference to prosecution was a mere warning about the consequences of testifying—specifically, testifying untruthfully.

### 3.

In any event, at this point, any interference is harmless, if not irrelevant. The Government applied for, ECF No. 234, and this Court Ordered, ECF No. 235, Hastings's compelled testimony under the protection of immunity. This immunity provides that "no testimony or other information compelled . . . (or any information derived directly or indirectly from such testimony or other information) may be used against [Hastings] in *any* criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with" this Court's November 13, 2024, order. *Id.* (emphasis added). So Hastings will testify anyway, making any Governmental interference entirely inconsequential. *See United States v. Pierce*, 62 F.3d 818, 832–33 (6th Cir. 1995). Accordingly, Defendant's Motion to Dismiss, ECF No. 226, will be denied.[10]

---

[10] Because Hastings now has broad use immunity under 18 U.S.C. § 6002, this Court need not address Defendant's alternative request that this Court, without the Government's consent, grant her transactional immunity—especially when that remedy is disfavored, and Defendant has not shown clear government misconduct. *See United States v. Talley*, 164 F.3d 989, 997–98 (6th Cir.

### III. EVIDENTIARY MOTIONS

Turning to the four evidentiary motions—all pertaining to the February 26, 2025, tax trial. The four pending motions are as follows: (1) Government's Motion *in Limine* to Exclude Testimony related Defendant's 2014 arrest, ECF No. 202 (sealed);[11] (2) Government's Motion *in Limine* to admit PPP loan application evidence if Defendant testifies, ECF No. 213; (3) Defendant's Motion *in Limine* to exclude evidence or references to any alleged past sexual misconduct or PPP loan evidence, ECF No. 218; and (4) Government's Motion to Withdraw its Motion *in Limine* to admit PPP loan application evidence (ECF No. 213), ECF No. 222. Each is resolved below.

### A.

"A 'motion *in limine*' is any motion to exclude or admit "evidence before the evidence is actually offered" at trial. *See Louzon v. Ford Motor Co.*, 718 F.3d 556, 561 (6th Cir. 2013)). Motions *in limine* are designed "to narrow the issues remaining" and "minimize disruptions," *United States v. Brawner*, 173 F.3d 966, 970 (6th Cir.1999), and help ensure "evenhanded and expeditious management of trials," *United States v. Phillips*, 146 F. Supp. 3d 837, 841 (E.D. Mich. 2015), *aff'd in part*, 677 F. App'x 294 (6th Cir. 2017) (internal citations omitted). Indeed, "the Supreme Court has authorized district courts to rule on motions *in limine*" under "the district court's inherent authority to manage the course of trials.'" *Id.* (cleaned up).

---

1999) (noting that when the government has not applied for immunity, the Sixth Circuit has "consistently held that a district court is without authority to either grant immunity to a witness who asserts his Fifth Amendment privilege against self incrimination, or to force the government to do so" absent "prosecutorial misconduct").

[11] This Court initially intended to resolve the Government's sealed Motion *in Limine*, ECF No. 202, in a separate, sealed *Order. See* ECF No. 207 at PageID.3438 n.2. But Defendant's unsealed Motion *in Limine* includes reference to the alleged conduct for which Defendant was arrested in 2014, *see* ECF No. 218, and all invasive details are omitted from this Opinion and Order, so this Court will address it in this unsealed Opinion and Order.

A district court should grant a motion *in limine* "only when [that] evidence is clearly inadmissible" or admissible "on all potential grounds." *Id.* (quoting *Indiana Ins. Co. v. Gen. Elec. Co*., 326 F. Supp. 2d 844 (N.D. Ohio 2004)). "In cases where that high standard is not met, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy, and potential prejudice may be resolved in proper context." *Id.* (internal citations omitted); *see also Good v. BioLife Plasma Servs*., *L.P.*, 605 F. Supp. 3d 947, 955 (E.D. Mich.), *recons. denied*, 647 F. Supp. 3d 555 (E.D. Mich. 2022); *Figgins v. Advance Am. Cash Advance Centers of Michigan, Inc*., 482 F. Supp. 2d 861, 865 (E.D. Mich. 2007) ("It may be desirable in many cases to defer ruling . . . until trial[.]").

The denial of a motion *in limine* "does not necessarily mean that the court will admit" or exclude "the evidence at trial." *Phillips*, 146 F. Supp. 3d 837 at 841. Rather, "[d]enial merely means that without the context of trial, the court" cannot "determine whether the evidence in question should be excluded" or admitted. *Indiana Ins. Co. v. Gen. Elec. Co*., 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004).

## B.

A little context is needed before addressing these evidentiary motions. The trial for the tax charges was, at one point, scheduled to begin on August 8, 2024. ECF No. 207 at PageID.3437. Shortly before trial, on July 24, 2024, the Government met with Donna Henke (Defendant's former bookkeeper) to discuss her testimony. *See* ECF No. 202 at 3360–61 (sealed). After the meeting, the Government thought Henke would testify that Mission stopped paying payroll taxes—conduct that began in April 2014—because Defendant was arrested in August 2014.[12] *See generally id.*; *see also* ECF No. 202-2 (sealed).

---

[12] The arrest related to sexual misconduct charges that were later dismissed. *See* ECF No. 202 at PageID.3361 n. 1; *see also* ECF No. 218 (Defendant discussing the sexual misconduct

On July 25, 2024, the Government filed one of the pending evidentiary motions, a Motion *in Limine* to exclude any evidence related to this August 2014 arrest. *See generally* ECF No. 202 (sealed). In essence, the Government seeks to exclude testimony from Donna Henke that suggested that this August 2014 arrest caused Mission to stop paying its payroll taxes because, in the Government's view, this testimony would be substantially more prejudicial to Defendant than probative under Federal Rule of Evidence 403. *See id.* In his Response, Defendant largely agrees, arguing that if Henke testifies that the 2014 arrest caused Mission to stop paying its payroll taxes, the testimony must be untruthful because the arrest occurred months after Mission stopped paying its payroll taxes.[13] *See* ECF No. 206 at PageID.3394–97 (sealed). The Government replied, further arguing that any evidence about the 2014 arrest is irrelevant. *See* ECF No. 208 (sealed).

In Defendant's sur-response, he shifts gears: he argues that he should be able to use Henke's purported representations to the Government that the August 2014 arrest caused Mission to stop paying taxes months earlier to impeach Henke during cross-examination. ECF No. 209 at PageID.3452 (sealed) ("[T]he Government's motion should be denied insofar as it restricts Defendant from using the July 24, 2024, [*sic*] to impeach Donna Henke depending on her testimony."). The Government filed a sur-reply, in which it "wishes to clarify that its motion was not intended to prevent Defendant from eliciting impeachment information, but to state that Defendant would not be entitled to a mistrial based on the jury hearing prejudicial information that Defendant himself elicited" under the doctrine of invited error. ECF No. 211 at PageID.3455–56 (sealed) (citing *United States v. Sharpe*, 996 F.2d 125, 129 (6th Cir. 1993)).

component).

[13] Confusingly, Defendant accused the Government of trying to admit this evidence, even though the Governments Motion sought to *exclude* the evidence. *See generally* ECF No. 206 (sealed).

While this Evidentiary Motion was pending, this Court issued an order on July 31, 2024, addressing several other evidentiary motions related to the tax trial. *See* ECF No. 207. The Order, among other things, determined that evidence related to Defendant's PPP loans was irrelevant to Defendant's tax trial and precluded the Government from introducing such evidence at the tax trial. *Id.* at PageID.3443. This Court adjourned the tax trial until September 24, 2024, to decide the remaining evidentiary motions. See ECF No. 214 at PageID.3556 n.1.

On August 8, 2024, this Court held an evidentiary hearing on the Government's Motion *in Limine* to exclude testimony regarding Defendant's 2014 arrest, ECF No. 202. *See* ECF No. 212. At the hearing, Henke clarified that her testimony was that Mission stopped paying payroll taxes in April 2014 because Defendant expanded his business and that she told the Government that this was "within [the] time frame" Defendant was arrested. *Id.* at PageID.3530; *see also supra* n.3.

A week later, the Government filed another pending Evidentiary Motion. *See* ECF No. 213. Indeed, the Government filed a Motion *in Limine* seeking to admit Defendant's PPP loan application that stated he was not subject to indictment to impeach Defendant's character for truthfulness in the hypothetical event that Defendant waives his Fifth Amendment rights and testifies at trial. *Id.* at PageID.3548, 3550–52. Defendant opposes this Motion. ECF No. 216.

On September 17, 2024, Defendant filed a motion *in limine* seeking to exclude any evidence related to Defendant's PPP loan applications—even for impeachment purposes—and any reference to the conduct underlying Defendant's 2014 arrest. *See generally* ECF No. 218. The next day, given this heap of pending evidentiary motions, the tax trial was canceled and rescheduled for February 26, 2025, upon agreement of the Parties. *See* ECF No. 225. That same day, the Government filed a Motion to Withdraw its Motion *in Limine* to admit Defendant's PPP

loan application to impeach Defendant if he testifies (ECF No. 213). ECF No. 222. The Government also filed a response to Defendant's Motion *in Limine*, ECF No. 218, "consenting to the relief requested by Defendant in ECF No. 218," and asking for "an Order that applies the evidentiary ruling to both [P]arties." ECF No. 223 at PageID.3641.

Take another breath—it is warranted. Despite the Parties' evidentiary battle in which they changed their requested relief and positions as often as one changes socks, the Government's late redirection makes resolving these motions simple. The Government's Motion to Withdraw its Motion *in Limine* seeking to admit PPP loan evidence to impeach Defendant if he testifies, ECF No. 222, will be granted. As a result, the Government's Motion *in Limine* seeking to admit PPP loan evidence to impeach Defendant if he testifies, ECF No. 213, will be withdrawn. Further, because the Government consented to Defendant's Motion *in Limine* seeking to exclude any evidence or reference to Defendant's PPP loans and prior sexual misconduct allegations, ECF No. 223, Defendant's Motion *in Limine*, ECF No. 218, will be granted. And because excluding any evidence or reference to Defendant's prior sexual misconduct allegations, in effect, excludes any evidence or reference to Defendant's 2014 arrest, the Government's Motion *in Limine* seeking to exclude testimony about Defendant's 2014 arrest, ECF No. 202 (sealed), will be granted.[14]

For clarity, the effect of these evidentiary decisions is as follows: (1) any evidence or reference to Defendant's 2014 arrest or the underlying allegations of sexual misconduct leading to the arrest is excluded from the February 26, 2025, tax-count trial, and (2) the Government may not introduce any evidence about PPP loans or reference these PPP loans at the February 26, 2025, tax-count trial.

---

[14] Not to mention, the Evidentiary Hearing in which Henke clarified her testimony regarding the 2014 arrest, *see supra* n.3, made evidence about the 2014 arrest largely irrelevant.

**IV. CONCLUSION**

Accordingly, it is **ORDERED** that Defendant's Motion to Dismiss, ECF No. 226, is **DENIED**.

Further, it is **ORDERED** that the Government's Motion to Withdraw ECF No. 213, ECF No. 222, is **GRANTED.**

Further, it is **ORDERED** that the Government's Motion *in Limine* to Admit PPP Loan Evidence, ECF No. 213, is **WITHDRAWN**.

Further, it is **ORDERED** that Defendant's Motion *in Limine* to Exclude Evidence or References to Any Alleged Past Sexual Misconduct or PPP Loans from the February 26, 2025, tax-count trial, ECF No. 218, is **GRANTED**.

Further, it is **ORDERED** that the Government's Motion in Limine to Exclude Evidence of Defendant's 2014 Arrest, ECF No. 202 (sealed), is **GRANTED**.

**This is not a final order and does not close the above-captioned case.**

Dated: November 22, 2024                    s/Thomas L. Ludington
                                            THOMAS L. LUDINGTON
                                            United States District Judge