UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,                      Case No. 1:20-cr-20365

v.                                  Honorable Thomas L. Ludington
                                  United States District Judge

DALE VERNON THRUSH,

                Defendant.

_____/

**OPINION AND ORDER (1) OVERRULING DEFENDANT'S OBJECTIONS TO
PRESENTENCE INVESTIGATION REPORT, (2) DIRECTING SUPPLEMENTAL
BRIEFING ON REMAINING OBJECTIONS, AND (3) DENYING IN PART MOTION
FOR DOWNWARD DEPARTURE OR VARIANCE**

Defendant Dale Thrush owned and operated several small businesses located in mid-Michigan, and Defendant was responsible for withholding and paying payroll taxes to the Internal Revenue Service. Although he collected those taxes, he failed to timely remit them during several quarters between 2014 and 2016 and did not timely file his personal income tax returns. The Government charged him in a 14-count indictment for failing to timely (1) pay employment taxes, and (2) file individual returns. Following a mistrial, appeal, and superseding indictment, the Government added, among other charges, a count of wire fraud. This wire fraud charge was based on Defendant's representation in a Paycheck Protection Program (PPP) loan application that he was not "presently subject to an indictment," even though the Government had already indicted and arraigned him on 14 tax counts. Tried separately from the tax counts, the wire fraud charge resulted in a conviction, as did seven of the 14 original tax counts.

In preparation for sentencing, Defendant objects to several enhancements reflected in his Presentence Investigation Report (PSR). He also moves for a downward departure or variance. As explained below, most of Defendant's objections will be overruled, the Parties will be

directed to file supplemental briefing on the remaining objections, and Defendant's Motion for a Downward Departure or Variance will be denied in part.

## I.

### A. General Background, Tax Repayment, Initial Indictment, and Arraignment

Defendant has owned several businesses in Lansing, Farwell, and Mt. Pleasant, Michigan, including 402 N. Mission St. LLC ("Mission")—a company organized to prepare the payroll for his other businesses—Xtreme Enterprises, Inc. ("Xtreme"), Verno All Tune, Inc. ("Verno"), and USAuto Repair, Inc. ("U.S. Auto"). ECF Nos. 1 at PageID.1–2; 291 at PageID.5283. As the sole owner of the businesses, Defendant was the "responsible person" for collecting and paying payroll taxes. ECF No. 1 at PageID.6; *see also* ECF No. 290 at PageID.5248. He was also required to file a Form 1040—an individual tax return—with the Internal Revenue Service (IRS) each year, reporting, among other things, his income from the businesses. ECF No. 1 at PageID.6; *see also* ECF No. 290 at PageID.5249.

But despite withholding payroll taxes from his employees' paychecks, *see* ECF Nos. 291 at PageID.5311, 5321–22, 5400, 5417–18; 293 at PageID.5697, Defendant did not timely pay Mission's quarterly payroll taxes in full between April 2014 and December 2016, except for Q2 2016. ECF No. 1 at PageID.6–9; *see also* ECF Nos. 290 at PageID.5248; 293 at PageID.5622. Nor did Defendant timely file a Form 1040 for calendar years 2013 through 2016. ECF No. 1 at PageID.6–9; *see also* ECF No. 292 at PageID.5584–88. Yet during those periods, Defendant spent thousands of dollars on ordinary business expenses, acquisition costs for a newly purchased gas station, construction costs for that gas station, and personal expenses. ECF No. 1 at PageID.6; *see also* ECF Nos. 291 at PageID.5331–43, 5357–62, 5365–68, 5409; 292 at PageID.5437–38, 5600.

Against that backdrop, on June 22, 2017, attempting to collect Defendant's unpaid taxes,

- 2 -

an IRS Revenue Officer (RO) interviewed Defendant. ECF No. 20 at PageID.69. The RO instructed Defendant to file his Form 1040s for 2013, 2014, and 2015 within six weeks and offered to "work with [Defendant] to piece together his individual income taxes." *Id.* Defendant's taxes went unpaid during those six weeks. ECF No. 20-1 at PageID.79.

Defendant eventually filed these back taxes, though untimely. To that end, records show that the IRS received Defendant's Form 1040s for 2013, 2014, and 2015 on January 9, 2020. *Id.* at PageID.70. He also claimed to have sent a Form 1040 for 2016 but explains that it must have been lost or unprocessed, so he sent another Form 1040 for 2016, which the IRS received on March 15, 2021. ECF No. 23 at PageID.104; ECF No. 319 (sealed) at PageID.7150. Records also show that Defendant remitted approximately $109,240 to the IRS for Mission's unpaid payroll tax balance from October 26, 2018, to July 29, 2020. ECF No. 319 (sealed) at PageID.7149.

In the end, the Government charged Defendant in a fourteen-count Indictment on August 19, 2020. ECF No. 1. Counts 1 through 10 alleged that Defendant willfully failed to timely pay quarterly payroll taxes for ten quarters from 2014 to 2016, violating 26 U.S.C. § 7202. *Id.* at PageID.5–7. Counts 11 through 14 alleged that Defendant willfully failed to timely file personal tax returns from 2013 to 2016, violating 26 U.S.C. § 7203. *Id.* at PageID.8–9. That same day, a warrant was issued for Defendant's arrest. ECF No. 2 (sealed).

On September 2, 2020, having retained counsel, ECF Nos. 6; 7, Defendant self-surrendered and appeared before Magistrate David R. Grand for his arraignment, ECF No. 9. Defendant acknowledged receipt of his Indictment, ECF No. 10, and Judge Grand released him from custody on bond subject to several conditions, ECF No. 11. One of these conditions required Defendant to not "apply for or enter into any loan or other credit transaction without the

previous written permission of the pretrial services office or supervising officer."[1] *Id.* at PageID.26. Soon after, on September 28, 2020, Defendant paid the remaining balance, $75,762, on Mission's unpaid payroll tax balance. ECF No. 319 (sealed) at PageID.7150.

### B. PPP Loans and EIDL Loan Modifications

Importantly, this case arose during the COVID-19 pandemic. During that time, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. 116-136. *United States v. Prather*, 138 F.4th 963, 967 (6th Cir. 2025). Among other things, the CARES Act created emergency loan programs for businesses to alleviate economic hardship flowing from the pandemic. *Id.* Two programs are relevant here.

First, these loan programs included the Paycheck Protection Program (PPP). *Id.* The PPP offered loans to eligible small businesses, allowing them to use the funds for employee compensation and other financial obligations. *Id.* Congress determined that private lenders would underwrite and issue these PPP loans, while the United States Small Business Administration (SBA) guaranteed them. *Id.* If a business "spent the funds appropriately, the loans could be fully forgiven." *Id.*

Second, the programs included expanding eligibility for participation in an existing government-sponsored program, the Economic Injury Disaster Loans program (EIDL), initially

---

[1] Defendant violated this condition of release multiple times. *See* ECF No. 105; 113. On September 20, 2021, he obtained a student loan for his daughter without Pretrial Services' approval, later claiming he did not realize such authorization was required. ECF No. 105 at PageID.1953. Pretrial Services warned Defendant that "he could not enter into any type of loan without prior permission" and notified the Court about the loan on March 31, 2022. *Id.* After that warning, Defendant sold a vehicle, paid off its loan balance, and secured a $100,000 auto loan to buy a new vehicle. *Id.* Defendant claimed that he "felt that [he] had replaced [a] prior loan and didn't realize he needed to report that." *Id.* On January 12, 2023, this Court found that these loans violated Condition 7(d) of Defendant's conditions of release. *See* ECF No. 113 at PageID.2079. Notably, the COVID-19 relief loans discussed in this Opinion and Order did not come to this Court's attention until months later.

created in the 1950s. *See* SMALL BUSINESS ACT OF 1953, Pub. L. 83-163, § 207, 67 Stat. 232, 235–36 (1953); *see also Small Bus. Admin. v. McClellan*, 364 U.S. 446, 447 (1960); *Prather*, 138 F.4th at 967; BRUCE R. LINDSAY, ET AL., CONG. RSCH. SERV., R47509, SBA COVID-19 EIDL FINANCIAL RELIEF: POLICY OPTIONS AND CONSIDERATIONS (2024). Like PPP loans, under this expansion, pandemic-driven EIDL loans offered emergency financial assistance for business expenses. *Prather*, 138 F.4th at 967. But unlike PPP loans, "EIDL loans were funded by the federal government, not private institutions, and had to be repaid." *Id.*

During the pandemic, Defendant obtained both PPP loans for Mission and EIDL loans for his other companies. *See* ECF No. 319 (sealed) at PageID.7150–52. Before Defendant was indicted in April 2020, he applied for and received a $110,000 PPP loan for Mission. *See id.* at PageID.7150; *see also* ECF No. 269 at PageID.4648. Also, before he was indicted, Defendant applied for and received four EIDL loans totaling $600,000 for several of his businesses. ECF No. 308 (sealed) at PageID.6151.

But more importantly than the loans that predated his Indictment, Defendant applied for PPP and EIDL loans *after* the Government indicted him. Indeed, on February 3, 2021, Defendant applied for a $121,060 PPP loan for Mission. *Thrush*, 2025 WL 1904425, at *5. And that PPP loan was later forgiven—along with the first PPP loan. *See Thrush*, 2025 WL 1904425, at *3; *see also* ECF No. 319 (sealed) at PageID.7150. Likewise, from July 19, 2021, to February 18, 2022, Defendant applied for and later received $2,044,600 in EIDL loans through six EIDL loan modifications. ECF No. 319 (sealed) at PageID.7151–52. Those loans were not forgiven because the EIDL program does not offer loan forgiveness. *See Prather*, 138 F.4th at 967.

The following bulleted timeline, based on the information available to this Court, helps understand the events relevant to these loans:

- **First Set of COVID-19 Relief Loans: April 2020–June 2020**

  o <u>April 2020</u> – Defendant applied for and obtained the first PPP loan for Mission, totaling $110,000. *See* ECF Nos. 319 (sealed) at PageID.7150; 269 at PageID.4648.

  o <u>June 2020</u> – $150,000 EIDL loan obtained for Thrush's Pit Stop, LLC ("Thrush's Pit Stop"), by Defendant's wife, identified as the 100% owner of Thrush's Pit Stop. *See* ECF Nos. 308 (sealed) at PageID.6151; 309-3 at PageID.6367, 6371, 6379, 6436–67.

  o <u>June 2020</u> – Defendant obtained $150,000 EIDL loan for Xtreme. ECF No. 308 (sealed) at PageID.6151.

  o <u>June 2020</u> – Defendant obtained $150,000 EIDL loan for Mission. *Id.*

  o <u>June 2020</u> – Defendant obtained $150,000 EIDL loan for Verno. *Id.*

- **Indictment, Arrest Warrant, and Arraignment: August 2020–September 2020**

  o <u>August 19, 2020</u> – The Government filed a fourteen-count Indictment against Defendant for tax-related crimes, some of which were felonies. ECF No. 1.

  o <u>August 19, 2020</u> – Warrant issued for Defendant's arrest. ECF No. 2 (sealed).

  o <u>September 2, 2020</u> – Defendant self-surrendered and appeared for his arraignment, acknowledging his Indictment. ECF Nos. 9; 10. Defendant was released on bond, subject to several conditions, including one requiring him to get Pretrial Services' permission before taking out loans. ECF No. 11.

- **Second Set of COVID-19 Relief Loans/Loan Modifications and PPP Loan Forgiveness: February 2021–February 2022**

  o <u>February 3, 2021</u> – Defendant applied for and received a second PPP loan for Mission, totaling $121,060. *Thrush*, 2025 WL 1904425, at *5.

  o <u>July 19, 2021</u> – First Mission PPP loan forgiven. ECF No. 319 (sealed) at PageID.7150.

  o <u>July 19, 2021</u> – Thrush's Pit Stop applied for and secured a $350,000 EIDL loan modification. *Id.* at PageID.7151; *see also* ECF No. 309-3 at PageID.6379. Like the initial EIDL loan for Thrush's Pit Stop, Defendant's wife, listed as the 100% owner of Thrush's Pit Stop, was the only signatory for this EIDL loan modification application. *See* ECF No. 309-3 at PageID.6381–405. The SBA distributed the funds for this loan modification on August 1, 2021. *Id.* at PageID.6379.

  o <u>August 9, 2021</u> – Defendant obtained a $350,000 EIDL loan modification for Verno. ECF No. 319 (sealed) at PageID.7151.

  o <u>September 27, 2021</u> – Second Mission PPP loan forgiven. *Id.* at PageID.7150.

    o  <u>December 25, 2021</u> – Defendant obtained a $387,400 EIDL loan modification for Verno. *Id.* at PageID.7151.

    o  <u>February 12, 2022</u> – Defendant obtained a $387,400 EIDL loan modification for Xtreme. *Id.*

    o  <u>February 18, 2022</u> – Thrush's Pit Stop obtained a $295,300 EIDL loan modification. *Id.* For this loan modification, as with the other EIDL loans and loan modifications, Defendant's wife initially sought the loan as the sole signatory. *See* ECF No. 309-3 at PageID.6378. But the SBA twice denied this loan modification application for a "[l]ack of repayment ability." *Id.* at PageID.6375, 6377. After that, Defendant's wife added Defendant to the application as a guarantor to include his income and financial net worth for repayment purposes. *Id.* at PageID.6375. As a result, Defendant was also a signatory on this loan modification application and signed it as an "Officer/Owner." *See id.* at PageID.6406–31. The SBA granted the loan modification once Defendant signed as a guarantor. *Id.* at PageID.6374.

### C. Mistrial, Appeal, Superseding Indictment, and Two Trials

Shifting back to this case's procedural development, after several adjournments during the COVID-19 pandemic, a jury trial began in November 2021, one of the first efforts to resume trials as the pandemic waned. ECF No. 61 at PageID.523. This Court declared a mistrial four days into the trial. That is in part because the Government's most material witness tested positive for COVID-19, and the jury could not accommodate a two-week adjournment, which was the minimum time period permitted under the administrative court rules during the pandemic. *Id.*

Defendant later moved to dismiss this case on double jeopardy grounds. ECF No. 64. This Court denied that motion. *United States v. Thrush*, No. 1:20-CR-20365, 2022 WL 2373351, at *4 (E.D. Mich. June 30, 2022). And the Sixth Circuit affirmed on appeal, holding that the "adjournment was proper and not an abuse of discretion." *United States v. Thrush*, No. 22-1588, 2023 WL 4564769, at *6 (6th Cir. July 17, 2023).

After the appeal, the Government filed a superseding indictment on July 26, 2023, which alleged the same 14 tax counts as the first indictment (Counts 1–14). *Compare* ECF No. 1 *with* ECF No. 118. But the Government augmented its allegations: the Superseding Indictment added

three new wire fraud charges. ECF No. 118 at PageID.2138–41. The Government based the wire fraud charges on the PPP loan applications that Defendant completed for Mission. *Id.* In those PPP loan applications, Defendant checked a box representing that he was not "presently subject to an indictment" when he applied for them. *United States v. Thrush*, No. 1:20-CR-20365, 2025 WL 1904425, at *3 (E.D. Mich. July 10, 2025). These charges, however, did not contemplate the EIDL loans that Defendant obtained for his companies. *See generally* ECF No. 118 at PageID.2138–41.

At any rate, the Government voluntarily dismissed two of the wire fraud charges with prejudice. ECF Nos. 142; 146. As a result, only one wire fraud charge remained: Count 16 of the Superseding Indictment, based on the second PPP loan that Defendant sought for Mission in February of 2021—after he was indicted for the tax charges in August 2020. *Thrush*, 2025 WL 1904425, at *5 (citing ECF No. 262 at PageID.4440–41, 4519–22, 4532–39). After that, this Court severed the wire fraud count from the original tax counts due to their subject-matter differences. *See* ECF No. 148.

Trials followed. To that end, trial for the wire fraud charge began on December 10, 2024. *See* ECF No. 264 at PageID.4585. The trial lasted two days, during which Defendant testified in his own defense. *See* ECF No. 312 at PageID.6555–56, 6560–62. Ultimately, the jury convicted Defendant of wire fraud under 18 U.S.C. § 1343 for his representation that he was not "presently subject to an indictment" when he applied for the February 2021 PPP loan. *See id.* at PageID.6556.

The new trial for the tax charges began on February 26, 2025. *See* ECF No. 313 at PageID.6563. In the end, on March 5, 2025, the jury returned a split verdict. *See* ECF No. 296. The jury convicted Defendant of seven counts, Counts 5, 9, 10, 11, 12, 13, and 14. *Id.* at

PageID.5773–75. And the jury acquitted Defendant of seven counts, Counts 1, 2, 3, 4, 6, 7, and 8. *Id.* at PageID.5772–73.[2]

### D. PSR and Sentencing Objections

To prepare for sentencing, a presentence investigation report ("PSR") was prepared on June 11, 2025, and finalized on August 15, 2025. ECF Nos. 308 (sealed); 319 (sealed). Based on Defendant's convictions, the PSR included an offense-level computation to determine a sentencing guideline range. ECF No. 308 (sealed) at PageID.6153–55, 6163. For Defendant's tax-count convictions, entitled Count Group 1, the PSR reflects an offense level of 14. *Id.* at PageID.6154. For Defendant's wire-fraud conviction, entitled Count Group 2, the PSR reflects an offense level of 30. *Id.* at PageID.6154–55. Based on these two count groups, the PSR reflects a combined adjusted offense level of 30, yielding a sentencing guideline range of 97 to 121 months in prison. *Id.* at PageID.6163.

Defendant lodged 17 objections to the PSR under Criminal Rule 32(f). *See* ECF No. 319 (sealed) at PageID.7169–91. The assigned Probation Officer resolved several of the objections, many of which did not affect Defendant's guideline range. *See id.*; *see also id.* at PageID.7163. But several objections related to Defendant's wire-fraud conviction, discussed further below, require factual or legal resolution by this Court.

---

[2] Given this Opinion and Order's focus on sentencing issues, it includes only background facts and the facts relevant to sentencing. For a comprehensive backdrop on both the tax and wire fraud charges in this case, *see, e.g.*, ECF No. 241. For a full presentencing factual development on just the wire-fraud charge, trial, and conviction, *see, e.g.*, ECF Nos. 134; 148; 160; 172; 214; 251; 260; 262; 269; 279; 312. And for a full presentencing factual development on just the tax charges, trials, and convictions, *see, e.g.*, ECF Nos. 26; 36; 61; 96; 100; 116; 207; 313.

## II.

### A. Sentencing Framework.

A district court must impose a sentence that is procedurally and substantively reasonable. *United States v. Fowler*, 819 F.3d 298, 304 (6th Cir. 2016). A district court imposes a procedurally unreasonable sentence if it "fail[s] to calculate (or improperly calculate[s]) the Guidelines range, treat[s] the Guidelines as mandatory, fail[s] to consider the § 3553(a) factors, [or] select[s] a sentence based on clearly erroneous facts." *Id.* (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)). This inquiry is functional—the "focus is not on what the district court said, but 'on what the transcript reveals what the court did.'" *United States v. Gunter*, 620 F.3d 642, 646 (6th Cir. 2010). Still, a district court must consider the "advisory Guidelines range" and "adequately explain the chosen sentence" for its sentence to be procedurally reasonable. *Fowler*, 819 F.3d at 304 (citation modified).

A sentence is substantively unreasonable if "it is not proportionate to the seriousness of the circumstances of the offense and offender." *United States v. Schrank*, 975 F.3d 534, 536 (6th Cir. 2020) (citation modified). For example, if a court imposes "little or no jail time" in a case involving an offense like "child pornography," the sentence is substantively unreasonable. *Id.* A sentence can also be substantively unreasonable if the district court "'selects [it] arbitrarily, bases the sentence on impermissible factors, . . . or gives an unreasonable amount of weight to any pertinent factor.'" *United States v. Greco*, 734 F.3d 441, 450 (6th Cir. 2013) (quoting *United States v. Conatser*, 514 F.3d 508, 520 (6th Cir. 2008)).

### B. PSR Objection Framework.

Before a court crafts a procedurally and substantively reasonable sentence, a "probation officer must conduct a presentence investigation and submit a report to the court." FED. R. CRIM. P. 32(c)(1)(A). Once the probation officer completes the report, the parties may object to it in

writing. FED. R. CRIM. P. 32(f). The probation officer may then revise the report, but he "must submit to the court and to the parties" an addendum "containing any unresolved objections." FED. R. CRIM. P. 32(g).

After that, the court "must—for any disputed portion of the presentence report or other controverted matter—rule on the dispute or determine that a ruling is unnecessary either because" it "will not affect sentencing, or because the court will not consider the matter at sentencing." FED. R. CRIM. P. 32(i)(3)(B). In ruling on such disputes, a court may "permit the parties to introduce evidence." FED. R. CRIM. P. 32(i)(2). But, at a minimum, the court "must allow the parties' attorneys to comment on the probation officer's determinations and other matters relating to an appropriate sentence." FED. R. CRIM. P. 32(i)(C).

### III.

At this stage, five categories of objections require resolution because they could affect sentencing. *See* FED. R. CRIM. P. 32(i)(3)(B). First, Defendant challenges several portions of the PSR concerning the EIDL loan modifications that he sought after his indictment and arraignment. *See* ECF No. 319 (sealed) at PageID.7180–81; 7183–85. The PSR includes those $2,044,600 in loan modifications in its total loss calculation as relevant conduct, resulting in a 16-level enhancement to Defendant's wire fraud offense level.[3] *See id.* at PageID.7152, 7154. Defendant disputes that enhancement. Second, Defendant objects to a two-point enhancement reflected in the PSR because he supervised, led, or organized criminal activity. *Id.* at

---

[3] At first, the PSR also included the EIDL loans Defendant obtained for his businesses before the Government filed the tax indictment. *See* ECF No. 308 (sealed) at PageID.6151–55. But both Defendant and the Government agreed that the EIDL loans preceding Defendant's August 2020 indictment should not be included in loss or restitution calculations, presumably because they did not include the alleged misrepresentations. ECF No. 319 (sealed) at PageID.7179; *see also* ECF No. 320 at PageID.7197, n.2. So those loans were removed from the loss total. ECF No. 319 (sealed) at PageID.7179.

PageID.7187–88. Third, he contests the PSR's three-level enhancement for obstruction of justice, imposed on the ground that he committed wire fraud while on bond for his tax charges. *Id.* at PageID.7190–91. Fourth, Defendant challenges an additional two-level obstruction enhancement, which the PSR attributes to perjury during his wire-fraud trial testimony. *Id.* at PageID.7189. Fifth, Defendant asserts that he accepted responsibility for his conduct and is therefore entitled to a reduction in his offense level—contrary to the PSR's conclusion that he is not. *Id.* at PageID.7182. Each objection category is addressed below.

### A. EIDL Loan Modification Enhancement Objections.

Begin with Defendant's dispute concerning the 16-point sentencing enhancement based on the PSR's finding that the $2,044,600 in EIDL loan modifications that Defendant obtained are relevant conduct. The PSR concludes that, although the Government did not charge Defendant for the loans, those loans nevertheless constitute "relevant conduct" under U.S.S.G. § 1B1.3(a)(2). ECF No. 319 (sealed) at PageID.7152. Accordingly, the PSR includes the EIDL loans Defendant obtained for his businesses after his Indictment in the total loss to victims, resulting in a sixteen-level enhancement under U.S.S.G. § 2B1.1(b)(1). *Id.* at PageID.7154.

The PSR reasons that the EIDL loan modifications are relevant conduct because they were obtained "as part of the same course of conduct or common scheme as the" PPP loan underlying Defendant's conviction. *See id.* at PageID.7185. On that front, when Defendant applied for the $2,044,600 in EIDL loan modifications after being indicted and arraigned, he certified that there had "been no substantial adverse change in [his] financial condition," including "arrest or conviction of felony, etc." *See, e.g.*, ECF No. 309-1 at PageID.6245. Yet by that point, Defendant had self-surrendered at his arraignment following his felony indictment and before his release on bond. So the PSR finds that he misrepresented his status to secure COVID-19 relief funds that he otherwise would not have received. *See* ECF No. 319 (sealed) at

PageID.7185. That alleged misrepresentation, the PSR notes, closely resembles the one made on the PPP loan application—namely, that he was not "presently subject to an indictment"—just months earlier. *See id.*

But Defendant disputes this enhancement. *See, e.g.*, ECF No. 314. He maintains that the EIDL loans are not relevant conduct because his self-surrender does not qualify as an "arrest," and the PPP and EIDL loans differ in structure due to collateral requirements and eligibility for forgiveness. *See* ECF No. 319 (sealed) at PageID.7183. He also maintains that the EIDL loan modifications for Thrush's Pit Stop are "particularly concerning" because he "neither applied for [the loans] nor was an owner in" Thrush's Pit Stop. *Id.* at PageID.7180. And Defendant asserts that even if the EIDL loan modifications were relevant conduct, he intended to repay them when he applied for them and *did* later repay them, rendering them ineligible for inclusion in the loss calculation. ECF No. 314 at PageID.6585–602.

This dispute presents two general inquiries. First, whether the Defendant's EIDL loan modifications are, in fact, relevant conduct. Second, if so, whether the loss calculation supporting the 16-point enhancement is accurate. These inquiries are outlined below.

### 1. Relevant Conduct.

Start with the threshold issue: whether Defendant's EIDL loan modifications are relevant conduct regarding his wire fraud conviction for PPP loan fraud. At sentencing, courts must consider all "relevant conduct" as defined by U.S.S.G. § 1B1.3 when determining a crime's offense level. *United States v. Knipp*, 138 F.4th 429, 437 (6th Cir. 2025). So long as it satisfies one of § 1B1.3's definitions, a court can "consider conduct that was charged, uncharged, dismissed, or even acquitted," *United States v. Parkey*, 142 F.4th 866, 872, n.1 (6th Cir. 2025), if that conduct "is criminal in nature," *United States v. Henry*, 819 F.3d 856, 865 (6th Cir. 2016).

And the court needs only to find that such conduct occurred by a preponderance of the evidence.[4] *Parkey*, 142 F.4th at 872, n.1. This holds true, and satisfies due process, even in "exceptional situations where the sentencing factor has a disproportionate effect on the sentence relative to the offense of conviction." *United States v. Mayle*, 334 F.3d 552, 557 (6th Cir. 2003) (citing *United States v. Graham*, 275 F.3d 490, 517, n.19 (6th Cir. 2001)).

There are two general categories of relevant conduct defined in § 1B1.3. First, § 1B1.3(a)(1) outlines a narrow category of conduct relevant for sentencing that is taken "during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." Second, key here, § 1B1.3(a)(2) delineates a broader category of conduct that, where applicable, "encompasses acts that were 'part of'" (1) "'the same course of conduct,'" or (2) a "'common scheme or plan as the offense of conviction.'" *Knipp*, 138 F.4th at 437 (quoting U.S.S.G. § 1B1.3(a)(2)); *see also United States v. Erwin*, 67 F. App'x 876, 880 (6th Cir. 2003) (applying § 1B1.3(a)(2) to grouped wire and mail fraud offenses under U.S.S.G. § 3D1.2(d)).[5]

Drilling down one more layer, the Guidelines define "same course of conduct" and "common scheme or plan." An offense is part of the "same course of conduct" depending on three factors: "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." U.S.S.G. § 1B1.3(a)(2) cmt. n.5(B)(ii); *United*

---

[4] Importantly, "neither the rules of evidence nor the right to confront witnesses applies at sentencing." *United States v. Christman*, 509 F.3d 299, 304 (6th Cir. 2007). Still, the evidence that the court considers must ensure the evidence that it considers has "sufficient or minimally adequate indicia of reliability and the defendant has an opportunity to rebut such evidence that he perceives is erroneous." *Id.* at 305.

[5] Notably, the "same course of conduct" category and the "common scheme or plan" category are disjunctive, so the acts at issue need only fall within one of the two categories. *See United States v. West*, 962 F.3d 183, 189 (6th Cir. 2020); *United States v. McCloud*, 935 F.3d 527, 533 (6th Cir. 2019); *see also* A. Scalia & B. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 116 (2012).

*States v. Brown*, 131 F.4th 337, 347, n.2 (6th Cir. 2025). Under that definition, "[w]hen one of the . . . factors is absent, a stronger presence of at least one of the other factors is required." U.S.S.G. § 1B1.3(a)(2) cmt. n.5(B)(ii). To separately qualify as a "common scheme or plan," the relevant events must "be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi.*" *Id.* § 1B1.3(a)(2) cmt. n.5(B)(i). In the end, "common scheme or plan" presents a low bar for acts to constitute relevant conduct. *See United States v. McCloud*, 935 F.3d 527, 532 (6th Cir. 2019).

### 2. Loss Calculation.

Assuming Defendant's EIDL loan modifications are relevant conduct, the inquiry shifts to how they affect the offense level and loss calculation. Begin here with Defendant's base offense level calculation. Under U.S.S.G. § 2B1.1(a)(1)(B), offenses that possess a "statutory maximum term of imprisonment of 20 years or more" yield a base level offense of 7. Defendant's wire fraud conviction under 18 U.S.C. § 1343 carries a maximum penalty of 20 years in prison. Thus, Defendant's base offense level for his wire fraud conviction is 7, as the PSR reflects. ECF No. 319 (sealed) at PageID.7154. That much is undisputed.

Moving to the disputed calculation: the loss calculation. The loss calculation is a specific offense characteristic that largely drives the total offense level for financial fraud crimes. *See* U.S.S.G. § 2B1.1(b)(1). To that end, the Sentencing Guidelines provide that, in fraud cases, a district court must adjust a defendant's offense level to reflect the amount of "loss" attributable to the offense and relevant conduct. *Id.* § 2B1.1(b)(1). For example, a defendant responsible for more than $95,000 in losses faces an 8-level increase. *Id.* § 2B1.1(b)(1)(E). A defendant responsible for more than $550,000 in losses faces a 14-level increase. *Id.* § 2B1.1(b)(1)(H). And one whose conduct caused more than $1,500,000 in losses faces a 16-level increase. *Id.* § 2B1.1(b)(1)(I). The point is that the enhancement increases with the magnitude of the loss,

ranging from $6,500 or less to more than $550,000,000. *See id.* § 2B1.1(b)(1). Conceptually, "[t]hat's the easy part." *United States v. Kozerski*, 969 F.3d 310, 312 (6th Cir. 2020).

But calculating the "'loss' can be harder." *Id.* When calculating loss, a court cannot engage in guesswork. *United States v. Roberts*, 919 F.3d 980, 988–89 (6th Cir. 2019) (vacating a district court's loss value enhancement because the court merely adopted the government's expert witness's "best guess at estimating the loss"). Rather, when a defendant contests the loss calculation in cases involving financial crimes, courts must "reasonably estimate the loss," "explain their calculation methods," and ensure that the defendant's sentence is based on "accurate information." *Id.* at 988 (citation modified).

The legal mechanics of the Guidelines compound this toil. Before November 2024, the Guidelines did not define "loss." *Prather*, 138 F.4th at 974. Instead, it interpreted the term in its commentary, "fill[ing] in the gaps with 'pages' of instructions on how to calculate the loss in different situations." *United States v. Agrawal*, 97 F.4th 421, 436 (6th Cir.), *cert. denied*, 145 S. Ct. 258 (2024) (quoting *United States v. Kozerski*, 969 F.3d 310, 313 (6th Cir. 2020)). The commentary generally instructed courts to calculate "loss as the greater of the actual loss or intended loss." *Id.* (citation modified). They described actual loss "as the reasonably foreseeable pecuniary harm that resulted from the offense," and intended loss as "the pecuniary harm that the defendant purposely sought to inflict." *United States v. You*, 74 F.4th 378, 397 (6th Cir. 2023) (citation modified). The commentary then provided several instructions concerning exclusions from losses, credits against losses, rules of construction, and special rules that can affect the loss calculation. *See, e.g., Agrawal*, 97 F.4th at 436–41.

These instructions on calculating "loss" generally received judicial deference. *See, e.g.*, *You*, 74 F.4th at 398. Indeed, courts must defer to the Sentencing Commission's interpretations

- 16 -

of its ambiguous guidelines when the interpretations fall "within the 'zone of ambiguity'" in the guideline. *Id.* at 397 (quoting *Kisor v. Wilkie*, 588 U.S. 558, 576 (2019)). But courts may not extend this deference to loss commentary that modifies or "add[s] to[] the guidelines themselves," rather than simply interpreting them, thus falling outside the zone of ambiguity.[6] *United States v. Riccardi*, 989 F.3d 476, 479 (6th Cir. 2021) (citing *United States v. Havis*, 927 F.3d 382, 386 (6th Cir. 2019) (en banc) (per curiam)). And the Sixth Circuit held that the commentary's general explanation that the guidelines' undefined term "loss" means "the greater of the actual loss or intended loss" reasonably interpreted the guidelines. *Prather*, 138 F.4th at 974–75; *but see Riccardi*, 989 F.3d at 479 (declining to defer to a special rule in the loss-calculation commentary that imposed a "bright-line rule requiring a $500 loss amount" in certain cases, regardless of the "victim's actual harm," because it functionally modified the guidelines).

---

[6] In *Havis*, the Sixth Circuit, sitting en banc, explained why courts do not defer to the Sentencing Commission's commentary that functionally alters, rather than interprets, its guidelines. Congress established the Sentencing Commission as an independent body tasked with developing policies and practices to guide federal sentencing. *Havis*, 927 F.3d at 385. Through the Sentencing Guidelines, the Commission guides judges on the appropriate type and length of sentences in each case. *Id.* While courts retain discretion to vary from those recommendations, that discretion is carefully constrained by procedural safeguards that require reasoned justification for any variance. *Id.* In this way, the Commission exercises a substantial share of governmental authority—second only to the power to take life—namely, the power to deprive a person of liberty. *Id.*

That authority sits at the intersection of legislative and judicial power. *Id.* The Commission is neither fully of one branch nor the other, but a "hybrid" entity that blends quasi-legislative rulemaking with quasi-judicial application. *Id.* The Supreme Court upheld its structure in *Mistretta v. United States*, 488 U.S. 361, 412 (1989), emphasizing the safeguards Congress imposed to preserve the separation of powers: congressional review of each guideline before it takes effect, and adherence to the notice-and-comment procedures of the Administrative Procedure Act. *Id.* But the same is not true for the Commission's commentary, which does not undergo those layers of oversight. That is because commentary holds no independent legal force—it merely interprets, rather than alters, the Guidelines. *Id.* Courts are bound by such commentary only so long as it reasonably construes the text it purports to explain; when it strays beyond that boundary, it commands no deference. *Id.* at 385–86.

Even so, in November 2024, the Sentencing Commission amended its guidelines and defined loss. *Prather*, 138 F.4th at 974, n.1. In so doing, the Commission adopted the old commentary's general definition. *Id.* That is, the Guidelines now define loss as the "greater of the actual loss or intended loss." U.S.S.G. § 2B1.1(b)(1)(A). Like before, "actual loss" means "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* § 2B1.1(b)(1)(C)(i). Also like before, "intended loss" means the "pecuniary loss that the defendant purposely sought to inflict" and includes "intended pecuniary harm that would have been impossible or unlikely to occur." *Id.* § 2B1.1(b)(1)(C)(ii).

The Commission retained much of the commentary instructions on loss calculations. *Id.* § 2B1.1 cmt. n.3. For instance, one comment provides that "loss" does not encompass ancillary costs such as interest, penalties, or fees, or expenses incurred to assist the government's prosecution. *Id.* § 2B1.1 cmt. n.3(C)(i)–(ii). Other comments offer "special rules" for specific cases. *See id.* § 2B1.1 cmt. n.3(E).

Critical here is a special rule entitled the "government benefits" rule. *Id.* § 2B1.1 cmt. n.3(E)(ii). The government-benefits rule provides that "in cases involving government benefits (*e.g.*, grants, *loans*, entitlement program payments), loss shall be considered to be not less than the value of the benefits by unintended recipients." *Id.* (emphasis added). An unintended recipient includes "ineligible applicants [who] fraudulently obtain grants," loans, or other benefits. *Agrawal*, 97 F.4th at 436–37. And when the rule applies to ineligible applicants, the loss equals "the full amount of the benefits because the applicant should have obtained nothing." *Id.* at 437 (citation modified). Notably, the rule does not provide for any consideration of the government agency's due diligence in assessing the accuracy of the applicant's representations or the applicant's understanding of the agency's queries.

Take the following example to further illustrate the point. Suppose an ineligible applicant fraudulently received $100,000 in government loans. Despite the definition of loss in the guidelines, under the government-benefits rule, the court "should calculate the net loss by subtracting the amount that the recipient would have received from the government if it had known of the fraud from the amount the recipient actually received from the government." *Id.* (citation modified). Because the ineligible loan applicant "would have received no [loan] at all if the government had known of the fraud," the net loss equals $100,000—"the total amount of the" loan. *Id.*

All said, since the guidelines added a definition of "loss," the Sixth Circuit has not addressed whether the government-benefits rule in the loss commentary adds to or modifies that definition. In other words, the Sixth Circuit has not addressed whether the rule is entitled to deference under the *Havis* framework. *See Riccardi*, 989 F.3d at 479; *see also United States v. Coleman*, No. 23-5624, 2025 WL 3078965, at *3 (6th Cir. Nov. 4, 2025). And even before that, the published Sixth Circuit cases involving the government-benefits rule either declined to apply it, *Kozerski*, 969 F.3d at 313–14, or merely assumed that it applied (without assessing whether it commanded deference) because neither party disputed its application, *Agrawal*, 97 F.4th at 436.

### 3. Supplemental Briefing.

Against that legal backdrop, this Court requires additional information to resolve Defendant's EIDL-loan-modifications objections. Thus, the Parties will be directed to file supplemental briefing addressing the following issues related to the inquiries outlined above:

A. Inquiry 1: Whether the EIDL loan modifications are relevant conduct.

    1. How is Defendant's participation in each included EIDL loan application criminal in nature, if at all? Relatedly, does Defendant's self-surrender constitute an "arrest," and does it matter—the EIDL loan modification application asked him to certify that there had "been no substantial adverse

change in [his] financial condition," including "arrest or conviction of felony, *etc.*"? *See, e.g.*, ECF No. 309-1 at PageID.6245 (emphasis added).

2. In a similar vein, was Defendant an owner of Thrush's Pit Stop, and does *de facto* ownership suffice as the Government suggests? Does it matter that Defendant acted in the capacity as an agent of another? How is the first EIDL loan modification for Thrush's Pit Stop relevant conduct when Defendant seemingly did not "execute" the application?

3. How did Defendant spend the EIDL loan modifications, and how did the expenditures overlap with PPP loan expenditures, if at all?

B. Inquiry 2: If the EIDL loan modifications are relevant conduct, whether and how they affect the loss calculation.

1. What was the actual loss and intended loss from the EIDL loan modifications under the guidelines' definitions? What evidence exists that Defendant did not intend to repay them?

2. If Defendant repaid the EIDL loans as he represents, how did he repay them and when? That is, where did Defendant locate the funds? Further, was it before the alleged EIDL loan fraud was detected? *See* U.S.S.G. § 2B1.1 cmt. n.3(D)(i).

3. Is the government-benefits rule entitled to deference? What ambiguity in the guidelines would warrant such deference, and does the government-benefits rule fall within the zone of that ambiguity?

The Parties should submit evidence to support all factual representations and cite directly to such evidence. To the extent the Parties rely on evidence already in the record, they must cite the record using the following format: ECF No. XXX at PageID.XXXX.

## B. U.S.S.G. § 3B1.1(c) Leadership Role Enhancement Objection.

Onto Defendant's Objection to the PSR's two-point enhancement under U.S.S.G. § 3B1.1(c) for his wire fraud conviction because he supervised, led, or organized criminal activity. ECF No. 319 (sealed) at PageID.7187–88; s*ee also* ECF No. 314 at PageID.6603–04. Defendant argues that no other person participated in the criminal activity underlying his wire fraud conviction—materially misrepresenting facts in a PPP loan application to obtain a PPP loan for Mission—so he "was not a leader . . . in the offense." ECF No. 314 at PageID.6604.

In response, the Government emphasizes Sue Hastings's testimony at the wire fraud trial, during which she discussed her role in completing the PPP loan application. *See* ECF No. 309 at PageID.6181–82. Based on that testimony, the Government contends that Hastings, Defendant's employee, participated in the wire fraud at Defendant's direction. This Court agrees with the Government.

Under § 3B1.1(c), a "two-level managerial-role sentencing enhancement applies when a defendant 'was an organizer, leader, manager, or supervisor in any criminal activity' involving four or fewer participants that was not otherwise extensive in its scope." *United States v. Minter*, 80 F.4th 753, 758 (6th Cir. 2023) (quoting U.S.S.G. § 3B1.1(c)). Unsurprisingly, for this enhancement to apply, "a defendant must have exerted control over at least one individual within a criminal organization." *Id.* (citation modified). On that front, "'[m]erely playing an essential role in the offense is not the equivalent to exercising managerial control over other participants.'" *Id.* (quoting *United States v. Vandeberg*, 201 F.3d 805, 811 (6th Cir. 2000)). And the "government bears the burden of proving that the enhancement applies by a preponderance of the evidence." *Id.* (citation modified).

Here, the Government has demonstrated by a preponderance of the evidence that the two-level enhancement under § 3B1.1(c) applies to Defendant's wire fraud conviction. Indeed, Sue Hastings's testimony indicates that she—Defendant's employee at Mission, whom he managed—(1) knew Defendant could not obtain the second PPP loan due to his Indictment, and (2) participated in its submission with that knowledge.[7]

---

[7] As an aside, Sue Hastings offered this testimony under a grant of immunity under 18 U.S.C. §§ 6002–03 after she represented that she would invoke her Fifth Amendment rights if called by the Government to testify. *See* ECF No. 235; *see also United States v. Thrush*, 772 F. Supp. 3d 822, 834 (E.D. Mich. 2024); ECF No. 262 at PageID.4550–51.

Begin with the testimony that indicates that she knew Defendant could not obtain the February 3, 2021, PPP loan due to his Indictment. Hastings testified that she and Defendant completed the February 2021 PPP loan application together in her office when she knew Defendant was under indictment. *See* ECF No. 262 at PageID.4532–39. Hastings also testified that Defendant had to submit the PPP loan application three times over two weeks before it was approved due to clerical errors. *See id.* at 4544–46. She stated that each time, she would complete the "top" part of the application, which sought Mission's administrative information, and Defendant would complete the bottom portion, which included the misrepresentation about his Indictment status. *Id.* But each time Defendant completed the bottom portion—which included the indictment question that may have disqualified his company from securing a loan if he had answered it correctly—she would oddly leave her office. *Id.* Yet she curiously could not remember why, only suggesting that she may have gone to the bathroom. *Id.* at PageID.4538.

Turn to the testimony that shows that Hastings participated in the PPP loan application at his direction, establishing that "a defendant must have exerted control over at least" one other person participating in the crime. *Minter*, 80 F.4th at 758. Again, Hastings completed the administrative portion of the PPP loan application before Defendant completed his portion. *See id.* at PageID.4532–39, 4544–46. And after Defendant completed his portion, in which he certified that he was not "presently subject to an indictment," Hastings would submit the finalized application at Defendant's direction. *Id.* at PageID.4537–40. Defendant also later directed Hastings to complete and submit the PPP loan forgiveness application, which completed the scheme to defraud. *Id.* at PageID.4552–54.

At bottom, the Government met its burden in showing that § 3B1.1(c)'s two-point enhancement applies to Defendant's wire fraud conviction. The Government demonstrated

beyond a preponderance of the evidence that Sue Hastings, Defendant's employee, knowingly participated in the PPP loan fraud at Defendant's direction and under his leadership. Thus, this Objection, entitled Objection 15, ECF No. 319 (sealed) at PageID.7187, will be overruled.

### C. U.S.S.G. § 3C1.3 Enhancement Objection.

Next, Defendant challenges the PSR's three-level enhancement under U.S.S.G. § 3C1.3, imposed on the ground that he committed wire fraud while on bond for his tax charges. ECF No. 319 (sealed) at PageID.7190. His challenge lacks merit.[8]

Under § 3C1.3, that "[i]f a statutory sentencing enhancement under 18 U.S.C. § 3147 applies," a court should "increase the offense level by 3 levels." Relevant here, 18 U.S.C. § 3147 requires a court to apply an additional "term of imprisonment of" up to ten years when "[a] person [is] convicted of a" felony committed while the person was released on bond, served consecutively "to any other sentence of imprisonment."[9] Functionally, "U.S.S.G. § 3C1.3 implements th[e] statutory directive" in § 3147. *United States v. Roberts*, 590 F. App'x 487, 489 (6th Cir. 2014).

Here, Defendant § 3C1.3's three-point enhancement applies to Defendant's wire fraud conviction. Defendant was released on bond for his tax charges on September 2, 2020. ECF No. 11. He submitted the fraudulent PPP loan application for Mission on February 3, 2021, while on bond, which led to his conviction for felony wire fraud under 18 U.S.C. § 1343. *Thrush*, 2025 WL 1904425, at *5. Thus, Defendant was convicted of a felony that he committed while released on bond—rendering the statutory enhancement under 18 U.S.C. § 3147 applicable, and, in turn,

---

[8] After he objected, Defendant seemingly conceded that this enhancement applies. *See* ECF No. 314 at PageID.6604–05. Even so, this Court will address the Objection for clarity of the record.

[9] A plain reading of § 3147 reveals that it provides a statutory maximum of ten years for sentences imposed under it. But the Sixth Circuit has not determined whether § 3147 provides a mandatory minimum sentence, yet it has suggested that it does not. *Roberts*, 590 F. App'x at 490.

rendering the three-point enhancement under § 3C1.3 applicable. So Defendant's Objection to this enhancement, entitled Objection 17, *see* ECF No. 319 (sealed) at PageID.7190, will be overruled.

### D. U.S.S.G. § 3C1.1 Perjury Enhancement Objection.

Turn to Defendant's Objection to the additional two-level obstruction enhancement under U.S.S.G. § 3C1.1, which the PSR attributes to perjury during his wire-fraud trial testimony. *See* ECF No. 319 (sealed) at PageID.7189. Defendant argues that "[t]here was no perjury." *Id.* The Government, in response, offers two examples of perjury from his wire fraud: (1) Defendant's testimony that he did not know the PPP loans could be forgiven when he applied for them; and (2) Defendant's testimony on direct examination that he did not believe that he was "presently subject to an indictment" when he applied for the second PPP loan for Mission. *Id.*

Under U.S.S.G. § 3C1.1, a court must "increase the offense level by 2 levels if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to" the "prosecution" of "the instant offense of conviction." Like here, § 3C1.1 obstruction-of-justice enhancement often becomes relevant when a defendant testifies at trial. *See, e.g.*, *United States v. Dunnigan*, 507 U.S. 87 (1993) (holding that applying the § 3C1.1 enhancement based on a court's finding that a defendant's testimony at trial was perjured does not violate an accused's right to testify under 18 U.S.C. § 3481 or the Constitution); *see also United States v. Medina*, 992 F.2d 573, 591 (6th Cir.1993) (same). That is because a defendant's perjury at trial triggers application of § 3C1.1. *Roberts*, 919 F.3d at 989–91.

Consider a fresh example from the Sixth Circuit: *United States v. Jackson*, 154 F.4th 422 (6th Cir. 2025). In *Jackson*, the defendant "went to trial on a charge of possessing methamphetamine and fentanyl with the intent to distribute." *Id.* at 425. The government presented evidence showing that they found large quantities of drugs and drug paraphernalia in

the defendant's truck and on his person during a traffic stop. *Id.* at 425–26. The defendant's "defense was straightforward" but unoriginal: "the drugs weren't his." *Id.* at 426. To that end, the defendant testified in his own defense and claimed that the officers framed him and "planted the drugs." *Id.* But the jury did not believe his testimony; it "swiftly voted to convict." *Id.* At sentencing, the district court applied the two-level obstruction-of-justice enhancement under § 3C1.1, finding that the defendant's trial testimony that the officers framed him by planting the drugs constituted perjury. *Id.* Finding no clear error in this finding, the Sixth Circuit affirmed.

As simple as the rule is—*i.e.*, if the court finds the defendant perjured himself, then it applies § 3C1.1's two-point enhancement—the process a court must follow in making a perjury finding is more involved. Indeed, to "protect a defendant's right to testify," a court must conduct a two-part analysis "to determine" whether a defendant "lied at trial." *Roberts*, 919 F.3d at 990. First, "'it must identify those particular portions of the defendant's testimony that it considers to be perjurious.'" *Id.* (quoting *United States v. Sassanelli*, 118 F.3d 495, 501 (6th Cir. 1997)). Second, "it must either make specific findings for each element of perjury or at least make a finding that encompasses all of the factual predicates for a finding of perjury." *Id.* These "perjury predicates are threefold: The defendant must have given (1) false testimony that (2) was willful and (3) concerned a material matter." *Jackson*, 154 F.4th at 429 (citation modified). And a court must make all findings by a preponderance of the evidence. *United States v. Collins*, 799 F.3d 554, 594 (6th Cir. 2015) (citing *United States v. Zajac*, 62 F.3d 145, 146 (6th Cir. 1995)). Under that framework, two aspects of Defendant's trial testimony constitute perjury.

### 1. First Perjury Finding.

At trial, Defendant testified on direct examination that he did not think that he was "presently subject to an indictment" when he completed the February 3, 2021, because "he had already been indicted" in August 2020. *See, e.g.*, ECF No. 269 at PageID.4627. Instead, he

claimed that he thought "subject to" was a "futuristic thing." *See id.* He reiterated this statement several times on direct and cross-examination. *Id.* at PageID.4635, 4662, 4684.

Overall, the record establishes, by a preponderance of the evidence, that Defendant held no such belief and that this testimony was false, satisfying the first element of perjury. To be sure, portions of Defendant's testimony show that he has, in other settings, used the phrase "subject to" to describe events expected to happen in the future. *Id.* at PageID.4627–35. He pointed, for instance, to an employee handbook he drafted stating that "[a]ny employee found to have engaged in such conduct will be subject to immediate discipline or possible discharge." *Id.* at PageID.4634. The handbook likewise provided that "[e]mployees who violate our substance abuse policy will be subject to disciplinary action up to and including termination." *Id.* at PageID.4633. He also produced a sign from Thrush's Pit Stop stating that "[a] minor who unlawfully purchases or uses tobacco product, vapor product or alternative nicotine product is subject to criminal penalties." *Id.* at PageID.4631. And he supplied another sign from his automotive business warning customers that if "they don't pick up" their cars "within a certain amount of time," they would be "subject to storage." *Id.* at PageID.4627.

But these examples do little work. They rest on language materially different from the PPP loan application at issue. Each uses the future continuous tense ("will be") or otherwise signals a contingent event yet to occur. The second PPP loan application, by contrast, employed the present-tense verb "is" and asked only about conditions "presently" applicable. *See, e.g.*, ECF No. 262 at PageID.4440, 4519–20. At most, then, Defendant's examples show that "subject to" *can* refer to future events when paired with particular verbs or conditional phrasing—which hardly shows that it *always* does, or that it did in the context of the second PPP application. *Accord Auer v. Robbin*s, 519 U.S. 452, 461 (1997). More importantly, they certainly do not show

that Defendant actually believed that "presently subject to an indictment" only swept in future possibilities rather than present realities.

Indeed, the broader record points in the opposite direction. Defendant acknowledged his Indictment as early as September 2020 and agreed to a bond condition limiting him from obtaining loans without prior approval from Pretrial Services. ECF Nos. 9, 10, 11. Yet despite that Indictment, acknowledgment, and bond condition, he never sought clarification from either his attorney or Pretrial Services before applying for the second PPP loan. ECF No. 269 at PageID.4652–62. That silence speaks volumes. In many ways, not seeking clarification suggests Defendant knew he was "presently subject to an indictment" and did not want clear information that would prevent him from obtaining the February 3, 2021, PPP loan for Mission.

Other portions of Defendant's testimony bolster that conclusion. Take Defendant's persistent struggle in trying to define his legal status once the Government filed the August 2020 Indictment. For example, on direct examination, he was asked, "[a]fter you were indicted, what did you consider your status?" *Id.* at PageID.4626. At first, he was stumped, having no meaningful way to avoid functionally stating that he was subject to indictment:

> I mean at the point -- I mean, my status after indictment? I mean, I was indicted so I mean -- I mean, nothing other than the indictment at that point was going on. I mean, it was a legal issue that had to -- I mean, I don't know exactly how to answer that. I mean, I was -- had been indicted.

*Id.* Defendant completed that effort by stating, in effect, that he was "presently subject to an indictment": He employed a synonym of "subject to," noting that he "was *under* indictment, I guess," *id.* (emphasis added). *See* CAMBRIDGE DICTIONARIES ONLINE, *under*, THESAURUS, CAMBRIDGE UNIV. PRESS & ASSESSMENT, https://dictionary.cambridge.org/thesaur us/under (last visited Nov. 18, 2025) [https://perma.cc/B74Y-EFS2] (listing "subject to" as a synonym of "under"). And when cornered on cross-examination, Defendant even claimed that

"[p]resently indicted is different than presently subject to" indictment. ECF No. 269 at PageID.4672.

Or take Defendant's inconsistent theory of what would make him "presently subject to an indictment." Defendant testified that he was not subject to an indictment when he applied for his first PPP loan in April 2020 because he "had [no] clue of anything that was going on" and "wasn't charged with a felony," or "incarcerated," leaving "nothing to answer yes to that question." *Id.* at PageID.4624. But by his own account, he was charged with a felony in August 2020—meaning that under that theory, he would have understood himself to be "subject to" an indictment on February 3, 2021, when he applied for the second loan.

That is not the only inconsistency. Defendant testified on direct examination that he received a target letter from the Government in July 2020, which notified him that he "was under investigation for criminal charges," at which point he "understood that [he] was subject to an indictment," until the grand jury returned the Indictment. *Id.* at PageID.4624–25. On cross-examination, however, Defendant admitted that he received a summons for a criminal investigation from the IRS in 2018. *Id.* at PageID.4662–70. Under that theory, he would have believed he was subject to an indictment from 2018 through August 2020, when he was indicted, yet he claimed he did not think he was in April 2020, when he applied for his first PPP loan. *See id.* at PageID.4623–25, 4662.

Moreover, Sue Hastings's testimony, discussed above, cements the falsity finding. Hastings testified that she stepped out of her office—not once, not twice, but three times—when Defendant reached the indictment question on the second PPP loan application. *See* ECF No. 262 at PageID.4532–39, 4544–46. Defendant himself confirmed that she did so. *See* ECF No. 269 at

PageID.4652. Her conduct makes sense only if both she and Defendant understood that the correct answer would doom the application, and that Defendant preferred to answer differently.

Defendant's testimony about his understanding of what "presently subject to an indictment" meant also satisfies the final two elements of perjury: willfulness and materiality. Defendant willfully declared that he did not believe he was presently subject to an indictment in February 2021 because "subject to" was a "futuristic thing" numerous times. *E.g., id.* at PageID.4627, 4635, 4662, 4684. Making those statements was not due to "confusion, mistake, or faulty memory," *Dunnigan*, 507 U.S. at 94; it was his entire defense. And these false statements "concerned a material matter." *Jackson*, 154 F.4th at 429 (citation modified). They bore on an essential element of wire fraud—whether Defendant "intended to defraud," *i.e.*, "knowingly misrepresented or omitted a material fact intending to deprive a victim of money or property." *United States v. Thrush*, 768 F. Supp. 3d 889, 896 (E.D. Mich. 2025) (citing *United States v. Maddux*, 917 F.3d 437, 443 (6th Cir. 2019)).

All in all, the record reveals by a preponderance of the evidence that Defendant perjured himself when he testified that he did not believe he was "presently subject to an indictment" when he applied for the February 3, 2021, PPP loan. To that end, it reveals that this testimony was false, willful, and material. Thus, § 3C1.1's two-point obstruction of justice enhancement applies to Defendant's wire fraud conviction.

### 2. Second Perjury Finding.

Although the Court has already determined that § 3C1.1's two-point obstruction-of-justice enhancement applies to Defendant's wire-fraud conviction based on his perjury, a second strand of Defendant's testimony warrants scrutiny. On direct examination, Defendant asserted that he did not know the PPP loans could be forgiven when he applied for them. ECF No. 269 at

PageID.4634–35. He further maintained that he "didn't find out" about forgiveness "until [Mission] had already gotten both loans." *Id.* at PageID.4636.

The record tells a different story. On balance, it shows by a preponderance of the evidence that Defendant knew the PPP loans were subject to forgiveness when he applied. The Government introduced the loan applications, where Defendant certified that he understood "loan forgiveness [would] be provided for the sum of documented payroll costs." *Id.* at PageID.4642, 4649. Once confronted with these certifications, Defendant's account shifted— several times.

He first admitted that he knew the second loan would be forgiven on February 3, 2021, when he applied for it. *Id.* at PageID.4643–44. After the Government noted that this conflicted with his testimony on direct examination, he recast his position, asserting that he "didn't know that [forgiveness] was actually going to be offered." *Id.* at PageID.4644. Even after acknowledging again that he had certified his understanding that forgiveness would be provided, he claimed he did not understand "that they could be forgiven." *Id.* at PageID.4648–49. He explained that the idea did not "sound real" because "we're talking about the Government giving away free money." *Id.* Yet he later testified once more that he knew the second PPP loan could be forgiven when he applied for it. *Id.* at PageID.4677. But he maintained that he did not fully understand that the first PPP loan could be forgiven when he applied for it. *Id.* at PageID.4677– 78.

Taken together, the shifting testimony, the certifications on the applications, and the internal inconsistencies show that Defendant's claim of ignorance regarding forgiveness was false.

This false testimony was also willful and material. Defendant testified that he did not know about loan forgiveness until after Mission received both PPP loans, and he did so willfully. His testimony was not the product of "confusion, mistake, or faulty memory." *Dunnigan*, 507 U.S. at 94. The shifts in his account, once confronted with the certifications in the PPP loan applications, show a deliberate effort to obscure the truth, aimed at weakening the Government's position that a core component of his scheme was to pursue loan forgiveness after fraudulently obtaining the second loan. *See* ECF No. 258 at PageID.4414 (reflecting in the jury instructions that "[t]he scheme alleged by the government is a scheme to fraudulently obtain [PPP] loan proceeds and subsequent loan forgiveness").

For the same reason, the false testimony was material. It went to the heart of the "scheme or artifice to defraud" element of wire fraud that the Government needed to prove. *See id.*; *see also Thrush*, 768 F. Supp. 3d at 896. So all three elements of perjury are satisfied for this strain of Defendant's testimony, too.

In short, two components of Defendant's testimony satisfy the elements of perjury by a preponderance of the evidence: (1) Defendant's testimony that he did not believe he was "presently subject to an indictment" when he applied for the February 3, 2021, PPP loan; and (2) Defendant's testimony that he did not know his PPP loans could be forgiven when he applied for them. As a result, § 3C1.1's two-point obstruction of justice enhancement applies to Defendant's wire fraud conviction. This Objection, entitled Objection 16, ECF No. 319 (sealed) at PageID.7189, will therefore be overruled.

### E. Acceptance of Responsibility Objection.

Finally, Defendant asserts that he accepted responsibility for his conduct and is therefore entitled to a reduction under U.S.S.G. § 3E1.1(a), contrary to the PSR's conclusion that he is not. *Id.* at PageID.7182. He contends that he "has always asserted that he was a victim of a

bookkeeper who was, at best, incompetent," but acknowledges "that he should have more closely monitored his business." *Id.* This double-speak misses the mark.

Under § 3E1.1(a), a defendant is entitled to a 2-level reduction if he "clearly demonstrates acceptance of responsibility for his offense." The phrase "clearly demonstrates" requires "defendants seeking a reduction" under § 3E1.1(a), "to acknowledge culpability in a timely, consistent way." *United States v. Coleman*, -- F.4th -- , 2025 WL 3078965, at *3 (6th Cir. Nov. 4, 2025). That is because "timeliness speaks to the sincerity of the defendant's acceptance of responsibility." *Id.* In this vein, "[f]or over thirty years," the Sixth Circuit has "refused to credit statements made after a defendant puts the government to its burden of proof." *Id.* (collecting cases). Further, consistent acknowledgment of culpability requires that a defendant's conduct not "contradict[] his admissions." *Id.* at *4. As a result, a court need not apply § 3E1.1(a) "to defendants who minimize[] their role," or "shift[] blame" to others. *Id.*

Here, Defendant's purported "acceptance" of responsibility is neither timely nor consistent. As for Defendant's untimeliness, Defendant put the Government to its burden of proof multiple times. As for inconsistency, while Defendant paid his back taxes, repaid much of his loans, and claims that he accepts responsibility for his crimes, he continues to shift blame to his former bookkeeper, labeling himself a "victim." ECF No. 319 (sealed) at PageID.7182. And rather than sincere acceptance of responsibility, he downplays his role, professing only that he failed to adequately monitor his staff. *Id.* This untimeliness and inconsistency "reveals a disqualifying lack of 'true remorse for specific criminal behavior.'" *Coleman*, -- F.4th -- , 2025 WL 3078965, at *4 (quoting *United States v. Morrison*, 983 F.2d 730, 734–35 (6th Cir. 1993)). Thus, Defendant has not "clearly demonstrated" that he accepts responsibility for his criminal

conduct, so this Court declines to apply the two-point reduction under § 3E1.1(a). So this Objection, entitled Objection 12, ECF No. 319 (sealed) at PageID.7182, will be overruled.

***

In sum, most of Defendant's Objections requiring resolution at this juncture will be overruled. Indeed, Objections 12, 15, 16, and 17 will be overruled. And the Parties will be directed to submit supplemental briefing for the above-referenced inquiries related to Defendant's EIDL loan objections on or before December 19, 2025.

**IV.**

Lastly, Defendant seeks a downward departure under U.S.S.G. § 5K2.0 or a variance under 18 U.S.C. § 3553(a). ECF No. 315. But based on 2025 amendments to the Guidelines, effective November 1, 2025, such a departure is no longer available—§ 5K2.0 no longer exists. *See* U.S. SENTENCING COMMISSION, *2025 Guidelines Manual* (effective Nov. 1, 2025), https://www.ussc.gov/guidelines/2025-guidelines-manual [https://perma.cc/52LF-3H82]. And this new Guidelines Manual governs Defendant's sentencing. *See Prather*, 138 F.4th at 974, n.1 (citing U.S.S.G. § 1B1.11(a) ("The court shall use the Guideline Manual in effect on the date that the defendant is sentenced.")). Thus, Defendant's Motion, ECF No. 315, will be denied in part to the extent it seeks a downward departure under the now nonexistent § 5K2.0. But it will be taken under advisement to the extent it seeks a variance under 18 U.S.C. § 3553(a).

**V.**

Accordingly, it is **ORDERED** that Defendant Dale Thrush's Objections 12, 15, 16, and 17 to the PSR, ECF No. 319 (sealed) at PageID.7182, 7187–91, are **OVERRULED**.

Further, it is **ORDERED** that the Parties are **DIRECTED** to submit supplemental briefing concerning Defendant's EIDL Loan Objections **on or before December 19, 2025**. As outlined above, the briefing should address the following:

- 33 -

A. Inquiry 1: Whether the EIDL loan modifications are relevant conduct.

1. How is Defendant's participation in each included EIDL loan application criminal in nature, if at all? Relatedly, does Defendant's self-surrender constitute an "arrest," and does it matter—the EIDL loan modification application asked him to certify that there had "been no substantial adverse change in [his] financial condition," including "arrest or conviction of felony, *etc.*"? *See, e.g.*, ECF No. 309-1 at PageID.6245 (emphasis added).

2. In a similar vein, was Defendant an owner of Thrush's Pit Stop, and does *de facto* ownership suffice as the Government suggests? Does it matter that Defendant acted in the capacity as an agent of another? How is the first EIDL loan modification for Thrush's Pit Stop relevant conduct when Defendant seemingly did not "execute" the application?

3. How did Defendant spend the EIDL loan modifications, and how did the expenditures overlap with PPP loan expenditures, if at all?

B. Inquiry 2: If the EIDL loan modifications are relevant conduct, whether and how they affect the loss calculation.

1. What was the actual loss and intended loss from the EIDL loan modifications under the guidelines' definitions? What evidence exists that Defendant did not intend to repay them?

2. If Defendant repaid the EIDL loans as he represents, how did he repay them and when? That is, where did Defendant locate the funds? Further, was it before the alleged EIDL loan fraud was detected? *See* U.S.S.G. § 2B1.1 cmt. n.3(D)(i).

3. Is the government-benefits rule entitled to deference? What ambiguity in the guidelines would warrant such deference, and does the government-benefits rule fall within the zone of that ambiguity?

The Parties should submit evidence to support all factual representations and cite directly to such evidence. To the extent the Parties rely on evidence already in the record, they must cite the record using the following format: ECF No. XXX at PageID.XXXX.

Further, it is **ORDERED** that Defendant's Motion for Downward Departure or Variance, ECF No. 315, is **DENIED IN PART** to the extent it seeks a downward departure and **TAKEN UNDER ADVISEMENT** to the extent it seeks a variance.

**This is not a final order and does not close this case.**

Dated: November 21, 2025                    s/Thomas L. Ludington
                                            THOMAS L. LUDINGTON
                                            United States District Judge