UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

DALE VERNON THRUSH,

    Defendant.

Case No. 20-cr-20365

Honorable Robert J. White

**OPINION AND ORDER SUSTAINING IN PART AND DENYING IN PART DEFENDANT'S OBJECTION TO PRESENTENCE REPORT CONCERNING FRAUD LOSS, DENYING DEFENDANT'S MOTION TO UNSEAL GRAND JURY MATERIALS (ECF NO. 345), DENYING DEFENDANT'S MOTION TO ADJOURN SENTENCING (ECF NO. 348), AND DENYING DEFENDANT'S MOTION TO CONTINUE THE EVIDENTIARY HEARING AS MOOT (ECF NO. 334)**

In December 2024, Defendant Dale Thrush was convicted of wire fraud for including misrepresentations on a government loan application. He was later convicted of several other charges for failing to pay payroll taxes and file individual tax returns in a timely manner. In advance of sentencing, he objected to several aspects of his Presentence Investigation Report (PSR). Many objections were resolved, but the Court directed supplemental briefing on those related to Thrush's total fraud-loss calculation. The Court then held an evidentiary hearing on those objections, notwithstanding Thrush's motion to adjourn it. Afterward,

Thrush moved to adjourn the sentencing hearing and to unseal grand jury materials, which he contends are necessary to support a post-conviction motion to dismiss the indictment.

As explained below, Thrush's outstanding objections concerning fraud-loss will be sustained in part and overruled in part. Further, his motions to unseal grand jury materials and adjourn sentencing will be denied. Finally, his motion to continue the already conducted evidentiary hearing will be denied as moot.

**I.**

The Court recited the facts of this case in its November 21, 2025, Opinion and Order resolving sentencing objections, ECF No. 327, and repeats only the facts necessary to resolve the remaining issues.

**A.**

Thrush owned and operated several small businesses located in mid-Michigan. Thus, he was responsible for withholding and paying payroll taxes to the Internal Revenue Service (IRS). Although he withheld those taxes from employees' paychecks, he failed to remit them timely during several quarters between 2014 and 2016. He also did not timely file his personal income tax returns for four years. As a result, in August 2020, the Government charged Thrush in a 14-count indictment for failing to (1) pay employment taxes, and (2) file individual returns.

On September 2, 2020, having retained counsel, Thrush self-surrendered to the United States Marshals for booking. He then appeared before Magistrate David R. Grand for his arraignment. ECF No. 9. There, Thrush acknowledged his Indictment, ECF No. 10, and Judge Grand released him from custody on bond, subject to several conditions. ECF No. 11. One of these conditions barred Trush from "apply[ing] for or enter[ing] into any loan or other credit transaction without the previous written permission of the pretrial services office or supervising officer." *Id.* at PageID.26.

**B.**

Importantly, this case arose during the COVID-19 pandemic. During that time, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. 116-136. *United States v. Prather*, 138 F.4th 963, 967 (6th Cir. 2025). Among other things, the CARES Act created emergency loan programs for businesses to alleviate economic hardship flowing from the pandemic. *Id.* Two programs are relevant here.

First, these loan programs included the Paycheck Protection Program (PPP). *Id.* The PPP offered loans to eligible small businesses, allowing them to use the funds for employee compensation and other financial obligations. *Id.* Congress determined that private lenders would underwrite and issue these PPP loans, while the United States Small Business Administration (SBA) guaranteed them. *Id.* If a

business "spent the funds appropriately, the loans could be fully forgiven." *Id.*

Second, the programs included expanding eligibility for participation in an existing government-sponsored program, the Economic Injury Disaster Loans program (EIDL), initially created in the 1950s. *See* SMALL BUSINESS ACT OF 1953, Pub. L. 83-163, § 207, 67 Stat. 232, 235–36 (1953); *see also Small Bus. Admin. v. McClellan*, 364 U.S. 446, 447 (1960); *Prather*, 138 F.4th at 967. Like PPP loans, pandemic-driven EIDL loans provided emergency financial assistance for business expenses. *Prather*, 138 F.4th at 967. But unlike PPP loans, "EIDL loans were funded by the federal government, not private institutions, and had to be repaid." *Id.*

With that context in mind, during the pandemic, Thrush obtained both PPP loans and EIDL loans for his companies. Before he was indicted in April 2020, Thrush applied for and received a $110,000 PPP loan for his payroll company, 402 N Mission ("Mission"). Also before he was indicted, Thrush applied for and received several EIDL loans for three of his businesses.

But more importantly than the loans that predated his Indictment, Thrush applied for such loans *after* the Government indicted him. On February 3, 2021, Defendant applied for a $121,060 PPP loan for Mission. *Thrush*, 2025 WL 1904425, at *5. In so doing, he certified that he was not "presently subject to an

- 4 -

indictment." *Id.* at \*2. That PPP loan was later forgiven. *Id.* at \*6.

Similarly, from July 19, 2021, to February 18, 2022, Thrush or his wife applied for and later received $2,044,600 in EIDL loans through six EIDL-loan modifications. Resembling his certifications to secure the PPP loan, in all but one of those EIDL loan-modification applications, he certified that there "had been no substantial adverse change" in the borrower's "financial condition," including, but "not limited to: judgment liens, tax liens, mechanic's liens, bankruptcy, financial reverses, arrest or conviction of felony, etc." *E.g.*, ECF No. 342-10, PageID.8809. Those loan modifications were fully collateralized and not forgiven because, again, the EIDL program does not offer loan forgiveness. *See Prather*, 138 F.4th at 967.

The following bulleted timeline helps to understand the specific events relevant to these loans:

- **First Set of COVID-19 Relief Loans (Pre-Indictment): April 2020–June 2020**
  - April 2020 – Thrush applied for and obtained the first PPP loan for one of his companies, Mission, totaling $110,000.
  - June 2020 – A $150,000 EIDL loan was obtained for Thrush's Pit Stop, LLC ("Thrush's Pit Stop") by Thrush's wife, who was identified as the 100% owner of Thrush's Pit Stop. ECF No. 342-12.
  - June 2020 – Thrush obtained $150,000 EIDL loans for three of his companies—Xtreme Enterprises Inc. ("Xtreme"), Verno All Tune, Inc. ("Verno"), and Mission—totaling $450,000. ECF Nos. 342-5; 342-6; 342-9.

- **Indictment, Arrest Warrant, and Arraignment: August 2020–September 2020**

  o <u>August 19, 2020</u> – The Government filed a fourteen-count Indictment against Thrush for tax-related crimes, some of which were felonies. ECF No. 1.

  o <u>August 19, 2020</u> – Warrant issued for Thrush's arrest. ECF No. 2.

  o <u>September 2, 2020</u> – Thrush self-surrendered and appeared for his arraignment, acknowledging his Indictment. Thrush was released on bond.

- **Second Set of COVID-19 Relief Loans/Loan Modifications and PPP Loan Forgiveness (Post-Indictment): February 2021–February 2022**

  o <u>February 3, 2021</u> – Thrush applied for and received a second PPP loan for Mission, which totaled $121,060.

  o <u>July 19, 2021</u> – Preindictment PPP loan forgiven.

  o <u>July 19, 2021</u> – Thrush's Pit Stop applied for and secured a $350,000 EIDL loan modification. As with the initial EIDL loan for Thrush's Pit Stop, Defendant's wife, listed as the 100% owner of Thrush's Pit Stop, was the sole signatory on this EIDL loan modification application. The SBA distributed the funds for this loan modification on August 1, 2021. ECF No. 342-13.

  o <u>July 21, 2021</u> – Thrush obtained a $350,000 EIDL loan modification for Xtreme. ECF No. 342-7.

  o <u>August 9, 2021</u> – Thrush obtained a $350,000 EIDL loan modification for Verno. ECF No. 342-10.

  o <u>September 27, 2021</u> – Post-indictment PPP loan forgiven.

  o <u>December 25, 2021</u> – Thrush obtained a $387,400 EIDL loan modification for Verno. ECF No. 342-11.

  o <u>February 12, 2022</u> – Thrush obtained a $311,900 EIDL loan modification for Xtreme. ECF No. 342-8.

  o <u>February 18, 2022</u> – Thrush's Pit Stop obtained a $295,300 EIDL loan modification. For this loan modification, as with the other EIDL loans and loan modifications, Thrush's wife initially sought

to be the sole signatory. *See* ECF No. 309-3, PageID.6378. But the SBA twice denied this loan modification application for a "[l]ack of repayment ability." *Id.* at PageID.6375, 6377. After that, Thrush's wife added him to the application to include his income and financial net worth for repayment purposes. As a result, Thrush was also a signatory on this loan modification application and signed it as an "Officer/Owner." ECF No. 342-14, PageID.8905. The SBA granted the loan modification once Thrush signed.

## C.

Shifting back to this case's procedural development, after several adjournments during the COVID-19 pandemic, a jury trial began in November 2021, one of the first efforts to resume trials as the pandemic waned. Following a mistrial, appeal, and superseding indictment, the Government added, among other charges, a count of wire fraud under 18 U.S.C. § 1343. ECF No. 118, PageID.2138–41. That charge was based on Thrush's representation that he was not "presently subject to an indictment" when he applied for the post-indictment PPP loan that was later forgiven. It did not, however, contemplate the post-indictment EIDL-loan modifications obtained in a similar fashion.

The Court severed the wire fraud count from the original tax counts due to their subject-matter differences. Trials followed. In December 2024, Thrush was tried and convicted of wire fraud. Then, from late February to early March 2025, he was tried for the tax charges. The jury returned a split verdict on March 5, 2025. It convicted Thrush of seven counts, Counts 5, 9, 10, 11, 12, 13, and 14. But it also

acquitted him of seven counts, Counts 1, 2, 3, 4, 6, 7, and 8.

Notably, after his convictions, Thrush's EIDL loans came into focus. From 2022 to June 2025, he made the monthly payments on those loans. *See* ECF Nos. 342-15, PageID.8925–28; 342-16, PageID.8936–39; 342-18, PageID.8957–60. But when he learned that the EIDL loan modifications could affect his sentence, from July through August 2025, Thrush repaid the modification amounts for Verno, Xtreme, and Thrush's Pit Stop in full. ECF Nos. 342-15, PageID.8928; 342-16, PageID.8939; 342-18, PageID.8960.

### D.

In advance of sentencing, a PSR was prepared. Based on Thrush's convictions, the PSR included an offense-level computation to determine a sentencing guideline range. For his tax-count convictions, titled Count Group 1, the PSR reflects an offense level of 14. For his wire fraud conviction, titled Count Group 2, the PSR reflects an offense level of 30. Based on these two count groups, the PSR reflects a combined adjusted offense level of 30, yielding a sentencing guideline range of 97 to 121 months' imprisonment.

That combined offense level is principally driven by the fraud-loss calculation for Thrush's wire fraud offense. On that score, the PSR viewed the $2,044,600 in post-indictment EIDL loan modifications obtained by Thrush or his

wife as relevant conduct. It therefore included them in its total loss calculation, resulting in a 16-level enhancement to Thrush's wire fraud offense level.

Thrush lodged 17 objections to the PSR. The assigned Probation Officer resolved several of the objections, many of which did not affect Thrush's guideline range. Still, five categories—all related to Thrush's wire fraud conviction—required factual or legal resolution. *See* FED. R. CRIM. P. 32(i)(3)(B). The Court resolved almost all those outstanding objections on November 21, 2025. ECF No. 327. But it directed supplemental briefing and conducted an evidentiary hearing on objections to the PSR's fraud-loss calculation to assess whether the EIDL loan modifications should be included in that total. Those objections remain unresolved.

On May 26, 2026, following the fraud-loss evidentiary hearing, Thrush moved under Federal Criminal Rule of Procedure 6(e)(3)(E)(ii) to unseal grand jury information and other sealed documents in this case and multiple other cases. ECF No. 345. He also moved to adjourn the sentencing hearing pending resolution of those issues. ECF No. 348.

## II.

Begin with the unresolved sentencing objections. The PSR concludes that, although the Government did not charge Thrush for the EIDL loans, those loans nevertheless constitute "relevant conduct" under U.S.S.G. § 1B1.3(a)(2). The PSR reasons that they were obtained "as part of the same course of conduct or common

scheme as the" PPP loan underlying Thrush's wire fraud conviction. On that front, when Thrush applied for the $2,044,600 in EIDL loan modifications after being indicted, booked, and arraigned, he certified that there had "been no substantial adverse change in" the borrower's "financial condition," including "arrest or conviction of felony, etc." *See, e.g.*, ECF No. 309-1 at PageID.6245. So the PSR finds that he materially misrepresented his status to secure COVID-19 relief funds for his businesses that he otherwise would not have received. *See* ECF No. 319, PageID.7185. That alleged misrepresentation, the PSR notes, closely resembles the one made on the PPP loan application underlying his conviction—namely, that he was not "presently subject to an indictment"—just months earlier. *See id.*

But Thrush disputes this conclusion. *See, e.g.*, ECF No. 314. He maintains that the EIDL loans are not relevant conduct because his self-surrender does not constitute an "arrest" and that the PPP and EIDL loans differ in structure due to collateral requirements and eligibility for forgiveness. *See* ECF No. 319, PageID.7183. He also maintains that the EIDL loan modifications for Thrush's Pit Stop are "particularly concerning" because he "neither applied for [the loans] nor was an owner in" Thrush's Pit Stop. *Id.* at PageID.7180. And Thrush asserts that even if the EIDL loan modifications were relevant conduct, he intended to repay them and *did* later repay them, rendering them ineligible for inclusion in the loss calculation. ECF No. 314, PageID.6585–602.

- 10 -

This dispute presents two general inquiries. First, whether Thrush's EIDL loan modifications are, in fact, relevant conduct. Second, if so, whether the loss calculation supporting the 16-point enhancement is accurate. These inquiries are addressed below in turn.

**1.**

To begin, most EIDL loan modifications constitute relevant conduct under U.S.S.G. § 1B1.3.

At sentencing, when determining a crime's offense level, courts must consider all "relevant conduct" as defined by U.S.S.G. § 1B1.3. *United States v. Knipp*, 138 F.4th 429, 437 (6th Cir. 2025). So long as it satisfies one of § 1B1.3's definitions, a court can "consider conduct that was charged, uncharged, dismissed, or even acquitted," *United States v. Parkey*, 142 F.4th 866, 872, n.1 (6th Cir. 2025), if, as a threshold matter, that conduct "is criminal in nature," *United States v. Henry*, 819 F.3d 856, 865 (6th Cir. 2016). And the court needs only to find that the government proved as much by a preponderance of the evidence. *Parkey*, 142 F.4th at 872, n.1. This holds true even in "exceptional situations where the sentencing factor has a disproportionate effect on the sentence relative to the offense of conviction." *United States v. Mayle*, 334 F.3d 552, 557 (6th Cir. 2003) (citing *United States v. Graham*, 275 F.3d 490, 517, n.19 (6th Cir. 2001)).

There are two general categories of relevant conduct defined in § 1B1.3. First, § 1B1.3(a)(1) outlines a narrow category of conduct relevant for sentencing that is taken "during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." Second, key here, § 1B1.3(a)(2) delineates a broader category of conduct that, where applicable, "encompasses acts that were 'part of'" (1) "'the same course of conduct,'" or (2) a "'common scheme or plan as the offense of conviction.'" *Knipp*, 138 F.4th at 437 (quoting U.S.S.G. § 1B1.3(a)(2)); *see also United States v. Erwin*, 67 F. App'x 876, 880 (6th Cir. 2003) (applying § 1B1.3(a)(2) to grouped wire and mail fraud offenses under U.S.S.G. § 3D1.2(d)).[1]

Drilling down one more layer, the Guidelines define "same course of conduct" and "common scheme or plan." An offense is part of the "same course of conduct" depending on three factors: "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." U.S.S.G. § 1B1.3(a)(2) cmt. n.5(B)(ii); *United States v. Brown*, 131 F.4th 337, 347, n.2 (6th Cir. 2025). To separately qualify as a "common scheme or plan," the relevant events must "be substantially connected to each other by at least one

---

[1] Notably, the "same course of conduct" category and the "common scheme or plan" category are disjunctive, so the acts at issue need only to fall within one of the two categories. *See United States v. West*, 962 F.3d 183, 189 (6th Cir. 2020); *see also* A. Scalia & B. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 116 (2012).

common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi.*" *Id.* § 1B1.3(a)(2) cmt. n.5(B)(i). In the end, "common scheme or plan" presents a low bar for acts to constitute relevant conduct. *See United States v. McCloud*, 935 F.3d 527, 532 (6th Cir. 2019).

Here, the Government has cleared that low bar for most of the EIDL loan modifications. By a preponderance of the evidence, it has shown that five of the modifications—the four that Thrush obtained for Verno and Xtreme and the one he co-signed for Thrush's Pit Stop—constitute relevant conduct.

The Government has established that Thrush's certifications for those five loan modifications were criminal in nature, satisfying its threshold obligation. After Thrush had been indicted on felony charges, booked, arraigned, and released on bond subject to restrictions on obtaining credit without prior approval from pretrial services, he certified that the companies seeking the loan modifications had not experienced a substantial adverse change in their financial condition resulting from a change in legal status. *E.g.*, ECF No. 342-10, PageID.8809, 8811. That certification was false. Thrush owned Verno and Xtreme, personally guaranteed each of their loan modifications, and likewise co-signed one modification for Thrush's Pit Stop. The bond conditions therefore directly impaired the companies' ability to obtain financing by restricting the ability of their sole owner and personal guarantor to obtain additional credit. Yet Thrush submitted the certifications to

induce the SBA to approve the requested modifications. *See id.* at PageID.8810. On this record, the Government has shown by a preponderance of the evidence that the misrepresentations were material and were made as part of a scheme to fraudulently obtain money from the SBA, thereby constituting conduct of a criminal nature. *See Kousisis v. United States*, 605 U.S. 114, 122-28 (2025).

Thrush's arguments to the contrary do not carry the day. He first contends that the certification concerned only the borrower—the corporate entity seeking the loan modification—not its owner or officer. ECF No. 328, PageID.7364-66. But on this record, that distinction is illusory. Again, because Thrush was the sole owner of Verno and Xtreme and personally guaranteed the four loan modifications for those companies and one of Thrush's Pit Stop's loan modifications, his court-imposed credit restrictions bore directly on the companies' ability to secure financing. Indeed, Thrush acknowledged those restrictions when he agreed to comply with his bond conditions. ECF No. 11, PageID.28. And his wife testified that obtaining credit became more difficult after his indictment. ECF No. 352, PageID.9816. Put simply, the record reveals that Thrush's credit restrictions were economically inseparable from the companies' borrowing capacity—and he knew it.

Thrush also contends that because he was never handcuffed and was unaware of his arrest warrant when he self-surrendered to authorities, he did not

know that he had been arrested. In his view, this undermines a finding that he knowingly misrepresented that there "had been no substantial adverse change" in the borrower's "financial condition," including, but "not limited to: . . . arrest or conviction of felony, etc." ECF No. 328, PageID.7371-72. But whether he thought he was arrested is not the relevant inquiry. The ultimate thrust of the relevant loan modification certification is whether the borrower has experienced a substantial adverse change in financial condition resulting, among other things, from a change in legal status due to criminal proceedings. *See, e.g.*, ECF No. 342-10, PageID.8809. Arrest and conviction for a felony were listed merely as examples of that change in legal status, as evidenced by the certification using to "include, but . . . not limited to" and "etc." And, more to the point, given Thrush's prior experience with PPP loan applications and corresponding fraud, his evasive, hairsplitting testimony that he did not understand his certification to be false, *see* ECF No. 352, PageID.9818-63, lacked credibility.

Next, the Government has established by a preponderance of the evidence that those five EIDL loan modifications were part of a "common scheme or plan" with the PPP loan underlying Thrush's wire-fraud conviction. The offenses were substantially connected by at least three common factors: (1) a common victim (the SBA); (2) a common purpose (to obtain pandemic-relief funds); and (3) a similar *modus operandi* (concealing the legal consequences of his federal criminal

proceedings by submitting materially false certifications on loan applications). Because these common factors substantially connected those offenses, they formed part of a common scheme or plan. *McCloud*, 935 F.3d at 532. And because the Government has also shown that the conduct was criminal in nature, the five EIDL loan modifications constitute relevant conduct under U.S.S.G. § 1B1.3(a)(2). So Thrush's objections will be overruled to the extent they argue that those loan modifications are not relevant conduct.

Even so, one EIDL loan modification—the first obtained for Thrush's Pit Stop by Thrush's wife, who was the sole signatory on the application—is not relevant conduct. Thrush took no part in securing that modification, so he did not falsely certify anything. Thus, the preponderance of the evidence does not establish that Thrush engaged in criminal conduct in connection with that loan modification. Thrush's objection therefore will be sustained insofar as he argues that the first Thrush's Pit Stop loan modification is not relevant conduct.

For clarity, the following chart specifies which loan modifications constitute relevant conduct:

| Entity | Loan Number | Date | Amount | Relevant Conduct? |
|---|---|---|---|---|
| Thrush's Pit Stop | 9934797906 (First Modification) | 7/19/2021 | $350,000 | No |
| Xtreme | 9823087902 (First Modification) | 7/21/2021 | $350,000 | Yes |

- 16 -

| Verno | 9841137908 (First Modification) | 8/9/2021 | $350,000 | Yes |
|---|---|---|---|---|
| Verno | 9841137908 (Second Modification) | 12/25/2021 | $387,400 | Yes |
| Xtreme | 9823087902 (Second Modification) | 2/12/2022 | $311,900 | Yes |
| Thrush's Pit Stop | 9934797906 (Second Modification) | 2/18/2022 | $295,300 | Yes |

**2.**

Having determined that most of the EIDL loan modifications are relevant conduct, the inquiry shifts to how they affect the offense level and loss calculation, if at all. As a first principle, fraud does not necessarily result in net pecuniary harm. *See Kousisis*, 605 U.S. at 124. That possibility is especially true in cases involving collateralized loans, a reality courts have recognized for centuries. *See, e.g., State v. Palmer*, 50 Kan. 318, 32 P. 29, 30 (1893) (observing that, "[t]hough money [may be] obtained by misrepresentation," in this context, "no injury [may] follow"). For the reasons explained below, that reality is present here: the Government has not shown an actual or intended loss stemming from the relevant EIDL loan modifications. They therefore do not enhance the fraud-loss calculation.

For background, begin with Thrush's base offense level calculation. Under U.S.S.G. § 2B1.1(a)(1)(B), offenses that possess a "statutory maximum term of imprisonment of 20 years or more" yield a base level offense of 7. Thrush's wire

fraud conviction under 18 U.S.C. § 1343 carries a maximum penalty of 20 years in prison. Thus, Defendant's base offense level for his wire fraud conviction is 7, as the PSR reflects. ECF No. 319, PageID.7154. That much is undisputed.

Moving to the disputed calculation: the loss calculation. The loss calculation is a specific offense characteristic that largely drives the total offense level for financial fraud crimes. *See* U.S.S.G. § 2B1.1(b)(1). To that end, the Guidelines provide that, in fraud cases, a district court must adjust a defendant's offense level to reflect the amount of "loss" attributable to the offense and relevant conduct. *Id.* § 2B1.1(b)(1). For example, a defendant responsible for more than $95,000 in losses faces an 8-level increase. *Id.* § 2B1.1(b)(1)(E). A defendant responsible for more than $550,000 in losses faces a 14-level increase. *Id.* § 2B1.1(b)(1)(H). And one whose conduct caused more than $1,500,000 in losses faces a 16-level increase. *Id.* § 2B1.1(b)(1)(I). The point is that the enhancement increases with the magnitude of the loss, ranging from $6,500 or less to more than $550,000,000. *See id.* § 2B1.1(b)(1). Conceptually, "[t]hat's the easy part." *United States v. Kozerski*, 969 F.3d 310, 312 (6th Cir. 2020).

But calculating the "'loss' can be harder." *Id.* When calculating loss, a court cannot engage in guesswork. *United States v. Roberts*, 919 F.3d 980, 988–89 (6th Cir. 2019). Rather, when a defendant contests the loss calculation in cases involving financial crimes, courts must "reasonably estimate the loss," "explain

their calculation methods," and ensure that the defendant's sentence is based on "accurate information." *Id.* at 988 (citation modified). Moreover, the government bears the burden of establishing the total loss by a preponderance of the evidence. *United States v. Hills*, 27 F.4th 1155, 1195 (6th Cir. 2022) (citing *United States v. Jones*, 641 F.3d 706, 712 (6th Cir. 2011)).

Against that backdrop, the Guidelines define "loss." Under the Guidelines, loss is the "greater of the actual loss or intended loss." U.S.S.G. § 2B1.1(b)(1)(A). Actual loss means "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* § 2B1.1(b)(1)(C)(i). By contrast, intended loss means the "pecuniary loss that the defendant purposely sought to inflict" and includes "intended pecuniary harm that would have been impossible or unlikely to occur." *Id.* § 2B1.1(b)(1)(C)(ii).

As for intended loss, on balance, the record does not support that Thrush purposely sought to inflict any pecuniary harm. For "loan-related fraud, 'intended loss is the amount the defendant subjectively intended not to repay.'" *United States v. Kraus*, 656 F. App'x 736, 739–40 (6th Cir. 2016) (quoting *United States v. Moored*, 38 F.3d 1419, 1426 (6th Cir. 1994)). Nothing here suggests that Thrush intended to skirt repaying the EIDL loan modifications. They were fully collateralized, with no indication that Thrush sought to thwart efforts to recover that collateral. *Cf. United States v. Calkins*, 193 F. App'x 417, 421 (6th Cir. 2006)

("[A] court may decline to reduce the intended loss by the collateral pledged where the district court finds that the defendant intended to deprive the lender of its collateral."). Further, for years, Thrush made hundreds of thousands of dollars in monthly payments on the loans, which were not forgivable loans.[2]

As for actual loss, the record likewise does not, by a preponderance of the evidence, reflect that the EIDL loan modifications caused actual pecuniary harm. Thrush has repaid the modification amounts in full. True, he did not fully repay them until July and August 2025, when he learned that the Government intended to use them at sentencing. Usually, that would mean the Court could not consider the July and August payments because the actual loss would be the value of the loan less "the amount of any repayment made by defendant *prior to the discovery of the fraud*." *Moored*, 38 F.3d at 1427 (emphasis added); *see also* U.S.S.G. § 2B1.1 cmt. n.3(D)(i). However, because this is a "case of a false loan application" with a fully collateralized loan, the Court must further "reduce the amount of loss by the amount recovered" before sentencing. *United States v. Quigley*, 382 F.3d 617, 622 (6th Cir. 2004); *see also* U.S.S.G. § 2B1.1 cmt. n.3(D)(ii). As a result, there is no actual loss arising from Thrush's likely fraudulent EIDL loan certifications.

---

[2] Before July 2025, when he contends that he was first notified that the Government would seek to use EIDL loan modifications at sentencing, Thrush had repaid approximately $398,883. *See* ECF No. 328, PageID.7377.

The Government's position does not change the analysis. It argues that the full value of the EIDL loan modifications constitutes actual loss because the SBA's disbursement of those funds prevented other eligible applicants from receiving them. *See* ECF No. 329, PageID.8290. But whatever effects the disbursements may have had on other prospective borrowers, those applicants possessed no cognizable financial interest in undistributed SBA funds while those monies remained in the SBA's possession. *See Cleveland v. United States*, 531 U.S. 12, 23–24 (2000). Accordingly, any pecuniary loss resulting from the loan modifications fell, if at all, upon the SBA—the entity that owned and disbursed the funds and that the Government has identified as the victim—not upon unidentified prospective applicants. And so because the SBA has recovered the full amount of the loan modifications before sentencing, the actual loss attributable to those transactions is zero. *Accord United States v. Chichy*, 1 F.3d 1501, 1511 (6th Cir. 1993) (declining to assess the "face value of the total amount of the" government "loan proceeds" as the actual loss total).[3]

---

[3] Initially, the Government relied on a special rule in the guidelines commentary entitled the "government benefits" rule, which provides that "in cases involving government benefits (*e.g.*, grants, loans, entitlement program payments), loss shall be considered to be not less than the value of the benefits by unintended recipients." U.S.S.G. § 2B1.1 cmt. n.3(E)(ii). But at the evidentiary hearing, the Government conceded that, because the rule appears in the Guidelines' commentary, the Guidelines' definition of loss must be ambiguous before this Court applies the government-benefits rule. *See* ECF No. 352, PageID.9810-11; *see also United States v. Riccardi*, 989 F.3d 476, 486-89 (6th Cir. 2021). The

All in all, the Government has not met its burden in showing, by a preponderance of the evidence, that the relevant EIDL loan modifications caused actual or intended loss. The total fraud-loss calculation therefore is limited to the loss from the forgiven PPP loan underlying Thrush's wire fraud conviction, totaling $121,060. Accordingly, Thrush's objections to the PSR will be sustained to the extent they argue that the relevant post-indictment EIDL loan modifications do not affect the fraud-loss calculation.

## III.

Turn next to Thrush's motion to unseal the grand jury materials. He invokes Federal Rule of Criminal Procedure 6(e)(3)(E)(ii), arguing that disclosure is necessary to prepare a motion to dismiss the indictment for prosecutorial misconduct. According to Thrush, the Government told the grand jury that he used PPP loan proceeds for personal expenses, while omitting that he had spent amounts exceeding the PPP loan proceeds on payroll and other authorized business expenses. ECF No. 345, PageID.9547. He contends that those alleged misrepresentations and omissions unfairly portrayed his conduct and led the grand jury to return an indictment on a theory that differed from the one the Government ultimately advanced at trial. *Id.* at PageID.9549. Thrush points to other

Government also conceded that it did not consider the Guidelines' definition of loss to be ambiguous. ECF No. 352, PageID.9810-11. So this Court need not apply the government-benefits rule.

prosecutions handled by the same Assistant United States Attorney that led to the dismissal of an indictment or stipulations to set aside convictions after prosecutorial misconduct in grand jury proceedings was alleged. On that basis, he seeks disclosure of the grand jury materials in this case, as well as records from those other proceedings.

The "the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings." *Douglas Oil Co. of California v. Petrol Stops Nw.*, 441 U.S. 211, 218 (1979). Thus, there are few, narrow exceptions to that secrecy rule. *See* Fed. R. Crim. P. 6(e)(3). One such exception, which Trush invokes here, allows disclosure of grand jury materials when a defendant "shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). But Thrush has not satisfied that exception: his motion to unseal fails for two independent reasons.

First, Thrush's conviction undermines his prospective motion to dismiss. A post-conviction motion to dismiss based on "prosecutorial misconduct before the *grand* jury" lacks merit when, as here, there is a "subsequent conviction by the *petit* jury." *United States v. Edmond*, 815 F.3d 1032, 1042 (6th Cir. 2016) (emphasis in original), *rev'd on other grounds sub nom Harper v. United States*, 581 U.S. 912 (2017); *see also United States v. Brown*, 332 F.3d 363, 375 (6th Cir. 2003); *United States v. Cobleigh*, 75 F.3d 242, 251 (6th Cir. 1996) (rejecting a

postconviction motion "claiming that perjured testimony was presented to the grand jury" because "any error by the prosecution before the grand jury is harmless" when the defendant "was subsequently convicted by the petit jury"). So whatever defects Thrush alleges in the grand jury proceedings, his subsequent conviction forecloses dismissal of the indictment on that basis. Because Thrush presents no viable ground to dismiss the indictment, Rule 6(e)(3)(E)(ii) provides no basis for piercing grand jury secrecy.

Second, apart from the effect of the conviction, the contemplated motion to dismiss would be untimely. Criminal Rule 12(b)(3) provides a list of motions that must be made before trial. Among those motions are those alleging "a defect in instituting the prosecution," including "an error in the grand-jury proceeding," Fed. R. Crim. P. 12(b)(3)(A)(v), like prosecutorial misconduct, *Edmond*, 815 F.3d at 1042. And a court can only entertain that untimely motion if the moving party shows good cause "to excuse the untimeliness." *Id.* (citing Fed. R. Crim. P. 12(c)(3)).

Thrush presents no sufficient excuse. He argues that he only recently learned of other cases in which the same prosecutor allegedly engaged in misconduct before a grand jury. But those proceedings occurred in 2024 and were matters of public record. *See United States v. Mann*, No. 4:20-cr-20599, ECF Nos. 607, 608 (E.D. Mich.). More importantly, Thrush himself raised substantially similar

arguments before trial. In a 2024 motion to dismiss, he argued that the grand jury had been improperly prejudiced by evidence concerning his use of PPP loan proceeds and alternatively requested an *in camera review* of the grand jury proceedings for prosecutorial misconduct. ECF No. 160, PageID.2781-83. The Court rejected those arguments and requests. That history demonstrates that the factual basis for his present argument was known to him before trial— contradicting his contention that he could not have raised the existing issues more forcefully as he does now. The addition of publicly available examples from unrelated prosecutions does not excuse his failure to pursue the dismissals when Criminal Rule 12 required him to do so.

Because Thrush cannot demonstrate a viable, timely basis for dismissing the indictment, he has not satisfied Rule 6(e)(3)(E)(ii). His request to unseal the grand jury materials must therefore be denied. The same disposition follows for Thrush's motion to adjourn sentencing. That motion rests entirely on the premise that the Court should first resolve the dispute over disclosure of the grand jury materials. Because the motion to unseal will be denied, no basis remains to postpone sentencing. The motion to adjourn will therefore be denied. The parties will instead be directed to file their sentencing memoranda in accordance with the schedule set by the Court.

## IV.

Accordingly, it is **ORDERED** that Defendant Dale Thrush's Objections 11 and 13 to the PSR are **SUSTAINED IN PART** insofar as they argue (1) that the relevant post-indictment EIDL loan modifications do not affect the fraud loss calculation, and (2) that the loan modification for Thrush's Pit Stop that he took no part in securing is not relevant conduct.

Further, it is **ORDERED** that those objections are **OVERRULED IN PART** insofar as they argue that the four EIDL loan modifications for Verno and Xtreme and the one for Thrush's Pit Stop that he co-signed are not relevant conduct.

Further, it is **ORDERED** that Defendant Dale Thrush's motion to continue the evidentiary hearing, ECF No. 334, is **DENIED AS MOOT**.

Further, it is **ORDERED** that Defendant Dale Thrush's motion to unseal grand jury materials, ECF No. 345, is **DENIED**.

Further, it is **ORDERED** that Defendant Dale Thrush's motion to adjourn sentencing, ECF No. 348, is **DENIED**.

Further, it is **ORDERED** that the parties are **DIRECTED** to file their sentencing memorandums **on or before July 17, 2026**.

- 27 -

Dated: July 13, 2026

s/Robert J. White
Robert J. White
United States District Judge